IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **MXR Imaging, Inc.,** | ) | **Case No. 1:24–CV–1269** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **JUDGE DONALD C. NUGENT** |
| **v.** | ) | |
| | ) | |
| **David Zavagno,** *et ano*, | ) | **MEMORANDUM OF OPINION AND** |
| | ) | **ORDER** |
| **Defendants.** | ) | |

This matter is before the Court on cross motions for summary judgment filed by
Plaintiff/Counterclaim Defendant MXR Imaging, Inc. ("MXR") and Defendant/Counterclaim
Plaintiff David Zavagno ("Zavagno") and his company, Universal Systems Diagnostics, Inc.
("USD" or "USDI"). For the foregoing reasons, Plaintiff's *Motion* (ECF #78) and Defendants'
*Motion* (ECF #80) are **DENIED.**

## I. Procedural History[1]

### A. The Pleadings

MXR filed the instant lawsuit against Mr. Zavagno on July 25, 2024, asserting various
claims against Mr. Zavagno related to its purchase of his medical imaging equipment sales
business and his subsequent employment with MXR.[2] (ECF #1).

---

[1] The factual summary is based on the Parties' statements of fact. Any potentially material facts
that are controverted and supported by deposition testimony, affidavits, or other evidence are
reviewed and presented in the light most favorable to the non-moving party. *Matsushita Elec.
Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[2] The Parties' relationship is explained in more detail *infra* § II.

– 1 –

MXR alleged the following claims against Mr. Zavagno:[2]

| | |
|---|---|
| **Count 1:** | Breach of the *Employment Agreement* |
| **Count 2:** | Breach of the *Asset Purchase Agreement* § 7.5 |
| **Count 3:** | Unjust Enrichment |
| **Count 4:** | Violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, *et seq.* |
| **Count 5:** | Misappropriation of Trade Secrets, R.C. 1331.61, *et seq.* |
| **Count 6:** | Unfair Competition |
| **Count 7:** | Tortious Interference with Business Relations |
| **Count 8:** | Breach of Duty of Loyalty |
| **Count 9:** | Defamation |

Mr. Zavagno responded on September 30, 2024, and filed counterclaims against MXR for breach of contract (Counterclaim 1), accounting (Counterclaim 2), and tortious interference (Counterclaim 3). (ECF #7, *Answer and Counterclaim*).

Mr. Zavagno filed a *Motion for Partial Judgment on the Pleadings* on October 22, 2024, (ECF #10), which the Court granted in part, dismissing MXR's defamation claim. (ECF #24).

On April 11, 2025, MXR filed a *Motion for Partial Judgment on the Pleadings* (ECF #28), seeking to dismiss the counterclaims against it for accounting (Counterclaim 2) and tortious interference (Counterclaim 3). The Court granted MXR's *Motion for Partial Judgment on the Pleadings* and granted Mr. Zavagno leave to amend his counterclaim. (ECF #31).

On July 22, 2025, Mr. Zavagno filed an *Amended Counterclaim*, (ECF #34), reasserting his counterclaim for tortious interference (Counterclaim 2), prompting MXR to file another *Motion for Partial Judgment on the Pleadings*, (ECF #41), which the Court granted, leaving only the counterclaim for breach of contract (Counterclaim 1) standing. (ECF #46).

---

[2] MXR also brings counts 2, 6, and 7 jointly against Mr. Zavagno and his company, USD. (ECF #57, *Amended Complaint*). Whether USD may be liable for conduct committed by Mr. Zavagno raises a question of agency, and "the existence of an agency relationship is a question of fact, rather than one of law," which the Court cannot decide on a motion for summary judgment. *Brainard v. American Skandia Life Assurance Corp.*, 432 F.3d 655, 661 (6th Cir. 2005).

On March 4, 2026, MXR filed an *Amended Complaint* adding Mr. Zavagno's company, USD, as a party to the lawsuit. (ECF #57). Both Mr. Zavagno and USD answered the *Amended Complaint* on March 18, 2026. (ECF #59); (ECF #60). In his *Answer*, Mr. Zavagno reasserted his counterclaim for breach of contract (Counterclaim 1) against MXR. (ECF #59). MXR answered the counterclaim and moved to dismiss or, in the alternative, strike it on April 8, 2026, which the Court denied on May 26, 2026. (ECF #68); (ECF #69); (ECF #100).

**B. Discovery Disputes**

Mr. Zavagno and MXR each filed a *Motion to Compel the Production of Evidence* on March 27, 2026, and April 2, 2026, respectively, and the Court granted each Party's *Motion* in its May 8, 2026, *Discovery Order*. (ECF #65); (ECF #67); (ECF #91, *Discovery Order*). On June 12, 2026, MXR filed an *Emergency Motion* to enforce the Court's *Discovery Order*, which the Court denied on June 22, 2026, (ECF #127). On June 23, 2026, Mr. Zavagno filed a motion to clarify the Court's June 22 Order denying MXR's *Emergency Motion*, (ECF #136), which the Court responded to on June 24, 2026, (ECF #140). On June 23, 2026, MXR filed its second *Motion to Compel Discovery*, (ECF #138), which the Court denied on July 1, 2026, (ECF #145).

**C. Motions for Summary Judgment**

On April 24, 2026, MXR filed for summary judgment on Mr. Zavagno's counterclaim for breach of contract. (ECF #78). Mr. Zavagno opposed the motion on May 18, 2026. (ECF #93). MXR filed a reply in support on June 1, 2026. (ECF #111). Mr. Zavagno then filed a sur-reply in opposition on June 22, 2026, (ECF #126), and MXR responded to it on July 1, 2026, (ECF #146).

Mr. Zavagno and USD filed for summary judgment on April 24, 2026. (ECF #80). MXR filed a response in opposition on May 26, 2026. (ECF #102). Both Defendants filed a reply in support on June 9, 2026. (ECF #115).

## II. Facts

### (i) Formation of Universal Medical Systems, Inc.

Mr. Zavagno formed his company, Universal Medical Systems, Inc. ("UMS"), in 1986. (ECF #34, *Amended Counterclaim*, p.1–2 ¶ 4). He sold new and used medical imaging equipment, such as CT and MRI scanners, to hospitals and clinics. (*Id.* at p.2 ¶ 5). Mr. Zavagno soon entered the veterinary medical market. (*Id.*). Mr. Zavagno operated as a middleman, sitting between original equipment manufacturers ("OEMs") that made the equipment and clinics who purchased it.

Mr. Zavagno would enter into various types of agreements with manufacturers of the medical devices. Two types of contracts generally governed equipment sales. One type of contract was a distributor or dealership agreement, where he'd buy equipment from an OEM and resell it to clinics. The other type of equipment sale occurred via an agency agreement, where Mr. Zavagno acted as a salesperson for the OEM. Unlike under the distributor agreement, he would not purchase and resell the equipment; rather, he'd facilitate a sale between an OEM and a buyer, earning a commission on the sale for referring the lead to the OEM. Finally, there are service contracts where Mr. Zavagno would assist in arranging for maintenance of the devices.

### (ii) Sale of UMS to MXR

After running UMS for several decades, Mr. Zavagno decided to sell his company. He sold substantially all the assets of UMS to MXR in September 2017 pursuant to an *Asset*

*Purchase Agreement* ("*APA*") for $3,745,000.[3] (ECF #34, *Amended Counterclaim*, p.2 ¶ 8); (ECF #1-1, *Asset Purchase Agreement*, p.16 § 2.4(a)). MXR purchased the name "Universal Medical Systems" and used it as the name for its new subsidiary, where it placed the assets and contracts it purchased from Mr. Zavagno. (ECF #1-1, *Asset Purchase Agreement*, p.10 § II ¶ 2.1(a)(xii)).

After closing, Mr. Zavagno still retained ownership of his corporate entity, which he renamed "Universal Systems Diagnostics, Inc." ("USD" or "USDI"). (ECF #7, *Answer and Counterclaim*, p.4 ¶ 32). This entity, USD, retained certain assets that Mr. Zavagno was permitted to sell under the *APA*. (ECF #1-1, *Asset Purchase Agreement*, p.45–46 § VII ¶ 7.10(a)–(d)); (*Id.* at p.8–12 § II ¶ 2.1(a)(i)–(xvi), § 2.1(b)(i)–(xvi)). The Parties later executed an additional document consisting of an updated list of excluded assets he could sell.[4] (ECF #86-1, p.73 [PageID #4441]). It appears that MXR agreed to assist Mr. Zavagno with unloading these assets. (ECF #86-7, p.60:9–61:7 [PageID #5005]); (*Id.* at p.8:15–17 [PageID #4492]); (*Id.* at p.60:24–61:7 [PageID #5005]). As part of the *APA*, MXR required Mr. Zavagno to agree to various non-compete, non-solicitation, and confidentiality provisions. (ECF #1-1, *Asset Purchase Agreement*, p.41–42 § VII ¶ 7.5(a)–(c)).

**(iii) Mr. Zavagno's Employment with MXR and Commissions "Understanding"**

In addition to purchasing the assets of his company, MXR hired Mr. Zavagno as an employee of MXR's new UMS subsidiary, where he received an annual base salary of $150,000. (ECF #1-1, *Employment Agreement*, p.1, ¶ 3). Under the *Employment Agreement*, his term of employment would commence on the date of closing in September 2017 and continue for three

---

[3] $3,745,000 reflects the "base price," which does not include the alterations listed in § 2.4(b)–(f) of the *APA*. (ECF #1-1, *Asset Purchase Agreement*, p.16 § 2.4(a)–(f)).

[4] The document listed six *Fixed Assets*, six *Work-in-Progress* accounts, and four *Open Orders*. (ECF #86-6, *Systems Retained by D. Zavagno—Updated 10-30-17*, p.3 [PageID #4987]).

years until September 2020. (*Id.* at p.1 ¶ 2). At the end of his three-year term, MXR opted to continue Mr. Zavagno's employment. Instead of extending the *Employment Agreement*, MXR offered him an at-will position via a letter in October of 2020 (the "*Employment Letter*"). (ECF #61, p.1 [PageID #1519]). Mr. Zavagno remained with MXR until the Parties mutually agreed to his departure, which occurred on May 31, 2024. (ECF #1-3, *Transition and Separation Agreement & Release*, p.1 [PageID #111]). Like the *APA*, Mr. Zavagno agreed to various confidentiality, non-compete, non-solicitation, and non-disparagement provisions as a condition of his employment. (*Id.* at p.4–6 ¶ 8(a)–(d)).

As part of his employment with MXR, Mr. Zavagno received commissions related to his sales. However, his commission arrangement with MXR is not entirely clear. No written agreement governed Mr. Zavagno's commissions between the purchase of his company in 2017 and 2023. During that time, Mr. Zavagno's commissions appeared to have been based on an "understanding" Mr. Zavagno reached with MXR's then-president Ted Sloan, the substance of which is uncertain. (ECF #86-4, p.92:4–11 [PageID # 4738]).

Mr. Zavagno's direct supervisor changed several times after he began his employment. Ultimately, Mr. Zavagno began reporting to Bernard Amato, MXR's Chief Financial Officer, in 2019. (*Id.* at p.69:2–3 [PageID #4732]). Upon working under Mr. Amato, Mr. Zavagno informed him of the verbal commission agreement with Mr. Sloan, and the verbal agreement remained in effect under his supervision. (*Id.* at p.156:10–15 [PageID #4754]). Mr. Amato acknowledged the existence of the verbal commissions agreement and recognized that Mr. Zavagno received

commissions under it in the past. (*Id.* at p.104:13–21 [PageID #4741]). Mr. Amato noted the confusion regarding this arrangement during his deposition.[5]

### (iv) Offset Agreements and Formalized Commissions Arrangement

As a result of Mr. Zavagno's somewhat amorphous commission arrangement and MXR's apparent agreement to assist him with offloading the excluded assets, the Parties frequently contested the amounts due and owing between them. To reconcile the disputed amounts, the Parties periodically entered into "offset" or "rollup" agreements. Under these agreements, the amount Mr. Zavagno owed to MXR was offset against his "future earned commissions." (ECF #86-15, p.1 [PageID #5422]). The first offset was entered on July 11, 2019, and the second on February 18, 2021. (*Id.*); (ECF #86-16, p.1 [PageID #5428]).

The Parties finally decided to formalize a commission arrangement for Mr. Zavagno, and executed the "Account Executive CT/MR and PET/CT 2023 Plan Commission Plan" ("*Commission Plan*")[6] in July of 2023. (ECF #61-1, *Account Executive CT/MR and PET/CT 2023 Plan Commission Plan*, p.1 [PageID #1523]). The *Commission Plan* designated Mr. Zavagno as an "Account Executive" and manager for "National Sales" and specified the percent commission he would earn on sales, though it did not explicitly indicate the types of transactions or customers for which he would receive a commission. (*Id.*).

---

[5] Mr. Amato put it best when asked: "When Mr. Zavagno first started reporting to you, what was his commission arrangement?" to which Mr. Amato responded: "Unclear." (ECF #86-4, p.90:2–5 [PageID #4738]).

[6] This agreement was to expire on December 31, 2023, and the Parties extended its applicability to May 31, 2024, via the *Separation Agreement* discussed in more detail *infra* § II (vi). (ECF #1-3, *Transition and Separation Agreement & Release*, p.1 [PageID #111]). Per the language of the *Separation Agreement* executed on February 15, 2024, MXR was to "provide to Zavagno its computation of commissions that are then due, or will become due, to Zavagno, as of March 1, 2024, no later than March 10, 2024." (ECF #1-3, *Transition and Separation Agreement & Release*, p.2 § 1(b) [PageID #112]).

In August of 2023, after implementing the *Commission Plan*, Mr. Zavagno claimed he was owed unpaid commissions. Effie Fryer, MXR's Vice President of Finance, conducted an audit. She looked for commissions owed to Mr. Zavagno between 2017 and September or August of 2023. (ECF #86-9, p.89:8–90:5 [PageID #5162–63]). She determined that Mr. Zavagno was owed roughly $73,000, which MXR paid to Mr. Zavagno. (*Id.* at p.9:4–5 [PageID #5142]); (*Id.* at p.92:1–4 [PageID #5163]); (*Id.* at p.92:1–6 [PageID #5163]). Ms. Fryer performed another "reconciliation" under the *Commission Plan* and found that Mr. Zavagno was owed $122,212 as of February 2026, which is the final amount MXR agreed to pay Mr. Zavagno. (*Id.* at p.57:21–25 [PageID #5154]); (ECF #78, p.12 [PageID #2112]). Mr. Zavagno still contends that he's owed unpaid commissions.

**(v) Siemens**

As part of the *Asset Purchase Agreement*, MXR purchased a March 1, 2017, dealership agreement Mr. Zavagno had with Siemens.[7]  (ECF #102, p.6 [PageID #5634]). After selling and assigning the Siemens dealership agreement to MXR, the relationship between MXR and Siemens deteriorated. One of the customers MXR received from Mr. Zavagno, BluePearl, had purchased Siemens equipment at two of its locations. (ECF #86-7, p.30:21–23 [PageID #4998]). It appears that Siemens either improperly installed the equipment or installed problematic equipment, and MXR paid to replace both imaging devices for BluePearl at some point prior to September 2019.

---

[7] The *Sellers Disclosures to the Asset Purchase Agreement* lists a January 5, 2015, Siemens Dealership Agreement held by UMS. (ECF #86-5, § 2.1(a)(iv)(8), p.9 [PageID #4855]).

More specifically, at BluePearl's Grand Rapids location, "Siemens did a fixed-site installation of a Symphony." (*Id.* at p.68:6–7 [PageID #5007]). This particular system was problematic and wouldn't function properly. (*Id.* at p.69:12–23 [PageID #5007]). To remedy the situation, MXR "decided to take on the burden of all the costs to replace the system as a whole, and took them from a Symphony and upgraded them to a[] [Siemens] Espree, which is another generation newer . . . [a]nd [MXR] ate all the costs and provided the system" free of charge. (*Id.* at p.70:10–14 [PageID #5008]). This transaction allegedly "really upset Siemens because it made them look bad . . . [a]nd they lost out on the service contract." (*Id.* at 70:15–17 [PageID #5008]).

BluePearl Overland Park also had a Siemens Symphony installed by Siemens. (*Id.* at p.72:7–8 [PageID #5008]). After installation of the device, a major component, the grading coil, failed. (*Id.* at p.72:18–24 [PageID #5008]). Here too, MXR decided to replace the system with a Siemens "Espree that was . . . provided, installed, refurbished and supported by MXR[,] [n]ot . . . Siemens." (*Id.* at p.73:25, 74:1–3 [PageID #5008–9]).

By stepping in and salvaging its relationship with BluePearl, MXR allegedly "put Siemens in a bad light, and they were not happy about that." (*Id.* at p.26:9–10 [PageID #4997]). On September 6, 2019, Siemens, without cause, terminated its dealership agreement with MXR and canceled two pending orders.[8] (*Id.* at p.26:11–13 [PageID #4997]); (ECF#86-18, *UMS-Merry – Termination Letter (9.6.19)*, p.1 [PageID #5440]). By terminating the dealership agreement, Siemens revoked MXR's ability to sell new Siemens equipment. (ECF 86-7, p.75:23–76:1 [PageID #5009]).

---

[8] The buyers on the other side of the two canceled orders still received Siemens products, "[j]ust instead of the equipment coming from Siemens, it was supplied by MXR[.]" (ECF 86-7, p.75:1–21 [PageID #5009]).

After the collapse of the relationship between MXR and Siemens, Mr. Zavagno told Mr. Amato he was attempting to mend the relationship and renegotiate a contract between the two companies. Mr. Amato believed that Mr. Zavagno had entered into a verbal agreement with Siemens on behalf of MXR. (ECF #86-4, p.16:5–18:8 [PageID #4719–20]). Mr. Amato unsuccessfully attempted to have Mr. Zavagno reduce this agreement to writing. (*Id.*). In response to Mr. Amato's repeated requests, Mr. Zavagno allegedly told him to "give it time." (*Id.* at p.17:5–25 [PageID #4719]).

Despite Mr. Amato's belief that there was a verbal agreement between MXR and Siemens, Mr. Zavagno caused his own company, USD, to enter into a *Distribution Agreement* with Siemens on May 15, 2020. (ECF #83, *P. Ex. 20*, p.5 [PageID #3022]). Under the *Distribution Agreement*, Mr. Zavagno could resell specific products that he purchased from Siemens.[9]  (ECF #86-1, p.188:6–23 [PageID #4470]). He argues he entered into this agreement to help MXR and assist in completing the two orders that Siemens had canceled and MXR could not fulfill. (*Id.*). Later, on August 19, 2021, Mr. Zavagno caused USD to enter into an *Agency Agreement* with Siemens, under which he would earn commissions from Siemens when he sold its products.[10] (ECF #53-12, p.23 [PageID #1168]).

---

[9] The *Distribution Agreement* stipulated that "Siemens Healthineers hereby appoints [Universal Systems Diagnostics, Inc.] as its *Non-Exclusive* Distributor with respect to the promotion and sale (but not maintenance or other service) of Contractual Products within the Contractual Territory as defined herein." (ECF #83, *P. Ex. 20*, p.1 [PageID #3018]) (emphasis retained). The agreement defined Contractual Products as the "DI-CT system: SOMATOM.go Now system (New only)[.]" (*Id.*). Contractual Territories included "[a]ll 50 United States and the District of Columbia." (*Id.*).

[10] Pursuant to the *Agency Agreement*, USD agreed to "act as Siemens Healthineers' sales agent to solicit Orders on Siemens Healthineers' behalf." (ECF #53-12, p.4 [PageID #1149]). In return, "Siemens Healthineers shall pay [USD] commissions as provided in the Agreement." (*Id.* at p.5 [PageID #1150]).

**(vi) Mr. Zavagno's Termination, *Separation Agreement*, and Lawsuit**

Ultimately, on February 15, 2024, Mr. Zavagno and MXR agreed to terminate their relationship and executed the "Transition and Separation Agreement & Release" ("*Separation Agreement*"). (ECF #1-3, p.1 [PageID #111]). The *Separation Agreement* stipulated that Mr. Zavagno's employment with MXR would end on May 31, 2024. (ECF #86-1, p.120:8–12 [PageID #4453]). As part of the agreement, the Parties included a "No Claims" and "Release" provision stating that both Parties released claims against each other unless they were raised in reasonable detail and in writing prior to Mr. Zavagno's planned departure in May of 2024.[11]

---

[11] The relevant provisions in the *Separation Agreement* provide that:

> 3.    No Claims. Except to the extent raised in reasonable detail and in writing prior to the Termination Date, neither the Company nor Zavagno shall have any remaining duties, liabilities or obligations to the other, except as expressly set forth in this Agreement, following the Termination Date, and each party hereto unconditionally releases and waives any such unasserted claims. (ECF #83, *P. Ex. 12*, p.2 ¶ 3 [PageID #2934]).

> \*        \*        \*

> 4.    Release.   The releases contained in this Agreement cover all rights, claims and causes of action of any kind which a party may have that are related to Zavagno's employment with the Company or the termination of that employment.  It also covers any rights or claims Zavagno may have to health or long-term disability or life insurance type benefits or any other claims of either party arising under common law, tort law, contract law or otherwise.  Upon execution of this Agreement and except as expressly provided for herein, Zavagno waives any and all claims he has or could have brought against the Company, its affiliates or any of its respective officers or employees (the "Releasees"), individually or part of a class or collective action[.] (ECF #83, *P. Ex. 12*, p.2 ¶ 4 [PageID #2934]).

> \*        \*        \*

> 7.    Entire Agreement.     This Agreement constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations, representations and discussions of the parties, whether oral or written, express or implied, including without limitation the Existing Agreements, it being agreed that as of the Termination Date the Existing Agreements shall be of no further force or effect. (ECF #83, *P. Ex. 12*, p.4 ¶ 7 [PageID #2936]).

To try and preserve its claims, MXR sent Mr. Zavagno a letter on May 10, 2024 (the *"May 10th Letter"*), outlining its claims against Mr. Zavagno and the supporting factual basis (ECF #83, *P. Ex. 54*, p.1 [PageID #3745]). The *May 10th Letter* stated, in part, that:

> The purpose of this letter is to put you on notice that MXR believes your client, David Zavagno ("Mr. Zavagno"), has breached his duty of loyalty and tortiously interfered with MXR's business and contractual relations.[a]
>
> MXR has learned that over the last year Mr. Zavagno sold new Siemens MRI equipment directly to MXR customers without involving or compensating MXR. As you are well aware, Mr. Zavagno has an implied condition of his employment that he will carry out his duties in good faith and not act to the detriment of his employer.
>
> Facts supporting these anticipated claims have come to light, including via MXR customers advising MXR that Mr. Zavagno sold at least nine (9) new Siemens systems all while MXR did not appear on any sales documentation.
>
> \*      \*      \*
>
> Mr. Zavagno is not permitted to sell such systems under a different and/or similar company name to MXR's customers, which of course circumvents the intent and purpose of the acquisition and his employment. Mr. Zavagno has not only breached the Asset Purchase Agreement, but also his duty of loyalty to MXR by improperly competing and "undercutting" his employer, while continuing to enjoy the benefits of that employment.

---

[a] While MXR is of course free to pursue any legal claims it believes it has against Mr. Zavagno at any time, I'm aware of the Transition and Separation Agreement & Release dated February 15, 2024, which, among other things, provides in a "No Claims" section that the parties will notify each other of claims *"in reasonable detail and in writing prior to the Termination Date (May 31, 2024)." See, Exhibit A, Section 3*. Since this letter is being sent prior to the Termination Date, MXR notifies your client of such claims and reserves its rights to pursue such claims against Mr. Zavagno.

(ECF #83, *P. Ex. 54*, p.1–2 [PageID #3745–46]).

As noted earlier, MXR filed suit against Mr. Zavagno on July 25, 2024.[12] In response, Mr. Zavagno asserted a breach of contract counterclaim against MXR. (ECF #59, *Answer to Amended Complaint and Counterclaim*, p.17 [PageID #1497]). He argues that pursuant to the *Employment Letter*, *Commission Plan*, and *Separation Agreement*, he was entitled to commissions which MXR has not tendered. (*Id.* at p.17–18 ¶ 34–36 [PageID #1497–98]).[13]

### III. Legal Standard

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56(c)). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 232, 248 (1986). Determination of whether a factual issue is "genuine" requires

---

[12] As explained above, MXR's claims were breach of the *Employment Agreement* (Count 1), breach of the *Asset Purchase Agreement* (Count 2), unjust enrichment (Count 3), violation of the Defend Trade Secrets Act of 2016 (Count 4), misappropriation of trade secrets (Count 5), unfair competition (Count 6), tortious interference with business relations (Count 7), breach of the duty of loyalty (Count 8), and defamation (Count 9), with Count 9 ultimately being dismissed. (ECF #1).

[13] Mr. Zavagno also alleged that MXR breached the *Separation Agreement* by refusing to grant him access to his universalsystems-designated email address. Given the Court's May 8, 2026, Order compelling MXR to grant him access to this email, Mr. Zavagno's claims regarding his email are MOOT. (ECF #91).

consideration of the applicable evidentiary standards. Although evidence may be presented in support of a summary judgment motion, the moving party need not support its motion with affidavits or similar materials that negate the non-movant's claims, but need only show that "there is an absence of evidence to support the non-moving party's case." *Morris v. Oldham Cty. Fiscal Court*, 201 F.3d 784, 788 (6th Cir. 2000) (citing *Celotex*, 477 U.S. at 323–25). The court will review the motion for summary judgment in the light most favorable to the party opposing the motion. *Matushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).

### (i) Mr. Zavagno's Motion for Summary Judgment

Mr. Zavagno argues he is entitled to summary judgment on all counts. He argues that the *Release* provision bars Counts 1–6 because MXR did not raise those claims in reasonable detail and in writing prior to his termination as required by the *Separation Agreement*. (ECF #80, p.12 [PageID #2140]). Mr. Zavagno acknowledges that MXR preserved Counts 7 and 8 by sending the *May 10th Letter* and argues that those claims fail for independent reasons. (*Id.* at p.15 [PageID #2143]). He also argues Counts 7 and 8 are limited to transactions involving the sale of Siemens equipment because those are the only transactions MXR referenced in the *May 10th Letter*. (*Id.*); (*Id.* at p.14 [PageID #2142]).

MXR responds that all its claims may proceed because the *Separation Agreement*'s *Release* does not apply. MXR reasons that the *Release* only applies to claims that are "related to Zavagno's employment." (ECF #102, p.20 [PageID #5648]); (ECF #83, *P. Ex. 12*, p.2 ¶ 4 [PageID #2934]). According to MXR, Mr. Zavagno's conduct was outside the scope of his

– 14 –

employment because it was not "calculated to facilitate or promote [MXR's] business". (ECF #102, p.20 [PageID #5648]) (citing *Kabula v. Smith*, 2023-Ohio-991, ¶ 11 (Ohio Ct. App. Mar. 27, 2023)). By falling outside the scope of his employment, MXR argues that its claims are not barred by the *Release*.

Mr. Zavagno disagrees, arguing that every claim against him is "related" to his employment and, therefore, within the scope of the *Release*. He appears to use the general definition of "related" and argues that "MXR's duty-of-loyalty claim exists only because Mr. Zavagno was an employee; its tortious-interference theory is premised on his alleged use of his MXR position to interfere with customer relationships; its breach of contract claims arise from the Employment Agreement and APA; and its trade-secrets claims depend on information he allegedly accessed during his employment." (ECF #115, p.3 [PageID #8689]).

The Parties' disagreement as to whether and to what extent the *Release* applies raises several questions of fact that the Court cannot resolve on a motion for summary judgment. Whether Counts 1–6 are waived requires determining if MXR's *May 10th Letter* satisfies the "in reasonable detail" language of the *Release* and if Mr. Zavagno's conduct was within the scope of his employment. *Broad Street Energy Co. v. Endeavor Ohio, LLC*, 975 F. Supp. 2d 878, 886 (holding that whether defendant complied with a contract requiring, among others, "a description of each Title Defect in reasonable detail" to be a "genuine issue of material fact that is not properly resolved at the summary judgment stage"); *Mumford v. Interplast, Inc.*, 119 Ohio App. 3d 724, 733–34 (1997) (noting that "[t]he expression 'scope of employment' cannot be accurately defined, because it is a question of fact to be determined according to the peculiar facts of each case"). In addition, resolving whether and to what extent the *Release* applies to claims 1–6 will affect the scope of transactions applicable to Counts 7 and 8. For example, if the

– 15 –

*May 10th Letter* satisfies the *Release*, it could plausibly be construed, as Mr. Zavagno argues, to limit the transactions to those involving the sale of new Siemens equipment.

Accordingly, Mr. Zavagno's *Motion for Summary Judgment* is **DENIED**.

**(ii) MXR's Motion for Summary Judgment**

MXR argues it is entitled to summary judgment on Mr. Zavagno's breach of contract counterclaim because Mr. Zavagno cannot prove damages, establish that he is owed any commissions, and that MXR already paid him all commissions that he's entitled to. (ECF #78, p.11 [PageID #2111]).

In support of its argument, MXR stands by its prior accounting and argues that the audits were comprehensive. MXR notes that the audits utilized "multiple data sources, including independent, third party Canon commission schedules and NXC imaging data, Salesforce records, national accounts data, and internal reconciliations." (*Id.* at p.7 [PageID #2107]) (citations omitted). MXR quotes Ms. Fryer's deposition testimony, where she indicated: "I went and looked for everything Dave had sold. I asked [], has anything – any equipment. I asked [for] the service agreements, has anything been sold? So I would have included everything." (ECF #78, p.8 [PageID #2108]) (quoting (ECF #86-9, p.42:11–14 [PageID #5151])) (alterations retained). MXR also notes that Mr. Zavagno "has been unable to identify a single sale or transaction for which he was not paid a commission." (ECF #111, p.11 [PageID #8622]).

Mr. Zavagno argues that "Ms. Fryer's preparation of the Commission Schedule was based on incorrect assumptions and incomplete information," and he points to activity on national accounts assigned to him that was attributed to other individuals. (ECF #93, p.7 [PageID #5563]); (ECF #126, p.6 [PageID #8807]). In support of his argument, he notes that Ms. Fryer focused primarily on his dealings with Canon and that she "only searched for sales with Mr.

Zavagno's name already attached to them in Salesforce, rather than independently auditing sales to national accounts to determine proper attribution." (ECF #93, p.7 [PageID #5563]).

It was well known at MXR that Mr. Zavagno did not personally enter sales information into the company's Salesforce sales tracking program. Generally, Mr. Zavagno relied on others to input this information into the system for him.[14] Mr. Zavagno provided evidence of an opportunity with VCA, a national account he was assigned, that was attributed to Danelle Hoover, whom he testified was his administrative assistant. (ECF #86-7, p.48:5–9 [PageID #5002]); (ECF #126, p.6 [PageID #8807]); (ECF #86-1, p.266:23–25 [PageID #4490]). This raises the question of whether Salesforce accurately reflected all of Mr. Zavagno's commissionable transactions and, therefore, whether Ms. Fryer relied on a complete dataset when calculating his commissions. This is sufficient to generate a genuine dispute of material fact regarding whether Mr. Zavagno received commissions to which he was entitled.

Accordingly, MXR's *Motion for Summary Judgment* is **DENIED**.[15]

---

[14] Shelby Lemler, MXR's Executive Vice President of Operations, testified that "Dave didn't input things into Salesforce. So it was either Danelle. Or we had another admin person at Nationwide, who would do it, who was a newer person that was never fully utilized, so she was confused into what should and shouldn't happen." (ECF #86-7, p.124:6–10 [PageID #5021]). Mr. Zavagno testified that Danielle Hoover was his administrative assistant. (ECF #86-1, p.266:23–25 [PageID #4490]). Confusingly, she is referred to as "Danielle" and "Danelle" throughout the record. *See e.g.* (ECF #126, p.6 [PageID #8807]). At some point, Mr. Manetta asked Mr. Zavagno to enter information into Salesforce. Mr. Manetta was asked "[w]hen you told Mr. Zavagno to generate leads in Salesforce, what did he tell you?" Mr. Manetta stated that he "[n]ever got an answer or – what was that lady's – I think it was Danielle that used to — he would say, "Talk to Danielle," and then Danielle would have no idea about it either half the time." (ECF #86-11, p.44:10–15 [PageID #5275]).

[15] Because MXR's *Motion for Summary Judgment* is denied, the Court need not reach the merits of Mr. Zavagno's Fed. R. Civ. P. Rule 56(d) motion. In addition, the Court declines MXR's request to limit Mr. Zavagno's recoverable damages to $122,212.

## IV. Conclusion

For the reasons stated above, Plaintiff/Counterclaim Defendant MXR Imaging, Inc.'s *Motion for Summary Judgment* (ECF #78) is **DENIED** and Defendant/Counterclaim Plaintiffs David Zavagno and Universal Systems Diagnostics, Inc.'s *Motion for Summary Judgment* (ECF #80) is **DENIED**.

The trial is scheduled for July 13, 2026, in Courtroom 15A at 12:00 PM, where the Court will hear the following claims from each Party:

**Plaintiff/Counterclaim Defendant MXR** — Breach of the *Employment Agreement* (Count 1), breach of the *Asset Purchase Agreement* (Count 2), unjust enrichment (Count 3), violation of the Defend Trade Secrets Act of 2016 (Count 4), misappropriation of trade secrets (Count 5), unfair competition (Count 6), tortious interference with business relations (Count 7), and breach of the duty of loyalty (Count 8).

**Defendant/Counterclaim Plaintiff David Zavagno** — Breach of contract (Counterclaim 1) regarding unpaid commissions.

IT IS SO ORDERED.

DONALD C. NUGENT
United States District Judge

DATED: July 7, 2026