**IN THEIN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **MXR IMAGING, INC.,** | ) | **CASE NO. 1:24-CV-01269** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE DONALD C. NUGENT** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **DAVID ZAVAGNO, *et al*.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## PLAINTIFF MXR IMAGING, INC.'S TRIAL BRIEF

Paul R. Harris (0079538)
John R. Mitchell (0066759)
Daniela Paez (0091212)
Katherine M. Poldneff (0088529)
Jack Maib (0098846)
TAFT STETTINIUS & HOLLISTER LLP
200 Public Square, Suite 3500
Cleveland, Ohio 44114-2302
Telephone: (216) 241-2838
Fax: (216) 241-3707
pharris@taftlaw.com
jmitchell@taftlaw.com
dpaez@taftlaw.com
kpoldneff@taftlaw.com
jmaib@taftlaw.com

*Attorneys for Plaintiff MXR Imaging, Inc.*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...............................................................................................iv

I.  INTRODUCTION ...................................................................................................... 1

II.  STATEMENT OF FACTS .......................................................................................... 2

    A.  DEFENDANTS ACTIVELY COMPETED AGAINST MXR, EVISCERATING THE PURPOSE OF MXR'S MULTI-MILLION DOLLAR PURCHASE OF ZAVAGNO'S PRIOR BUSINESS .......................... 2

        1.  MXR'S MULTI-MILLION DOLLAR PURCHASE OF UMS'S ASSETS ....................................................................................................... 2

        2.  MXR CHOOSES NOT TO PURCHASE UMS'S UNSALABLE INVENTORY DUE TO LACK OF VALUE ............................................ 4

        3.  ZAVAGNO AGREES TO ROBUST RESTRICTIVE COVENANTS IN THE EMPLOYMENT AGREEMENT....................... 4

        4.  ZAVAGNO IMMEDIATELY BREACHES THE APA BY OPERATING A COMPETING BUSINESS.............................................. 5

        5.  MXR PURCHASES UMS'S DEALERSHIP AGREEMENT WITH SIEMENS, WHICH IS LATER TERMINATED AFTER MXR, AT ITS OWN COST, FIXES SIEMENS' INSTALLATION ISSUES AT BLUEPEARL VET LOCATIONS ...................................... 5

        6.  DEFENDANTS ENTER INTO AGREEMENTS WITH OEMS TO COMPETE WITH MXR ...................................................................... 6

        7.  DEFENDANTS COMPETE WITH MXR BY SELLING DIRECTLY TO MXR CUSTOMERS ...................................................... 8

        8.  ZAVAGNO SABOTAGES MXR'S NEGOTIATIONS WITH SIEMENS ................................................................................................. 9

        9.  ZAVAGNO CONCEALS HIS UNLAWFUL COMPETITION............. 10

        10.  ZAVAGNO EXECUTES THE SEPARATION AGREEMENT, AND MXR PRESERVES ITS CLAIMS AGAINST ZAVAGNO PRIOR TO THE TERMINATION DATE ............................................. 10

    B.  MXR PAID, AND TENDERED PAYMENT OF, ALL COMMISSIONS DUE TO ZAVAGNO UNDER MXR'S COMMISSION PLAN........................ 11

        1.  ZAVAGNO'S AT-WILL EMPLOYMENT WITH MXR AND MXR'S COMMISSION PLAN................................................................. 11

        2.  ZAVAGNO AND MXR ENTER INTO TWO OFFSET AGREEMENTS AND A THIRD RECONCILIATION ON AMOUNT OWED TO ZAVAGNO......................................................... 13

        3.  ZAVAGNO EXECUTES THE SEPARATION AGREEMENT............ 13

            4.      MXR PERFORMS A COMPREHENSIVE AUDIT OF COMMISSIONS THAT MAY BE OWED TO ZAVAGNO................. 14

III.     DISCUSSION OF THE CONTROLLING LAW.............................................................. 15

     A.     MXR WILL PREVAIL ON ITS CLAIMS AT TRIAL....................................... 15

          1.     MXR WILL PREVAIL ON ITS BREACH OF CONTRACT CLAIMS ............................................................................... 15

               A.     BREACH OF THE EMPLOYMENT AGREEMENT ............... 15

               B.     BREACH OF THE APA ............................................................ 16

          2.     MXR WILL PREVAIL ON ITS CLAIM FOR UNJUST ENRICHMENT .......................................................................... 16

          3.     MXR WILL PREVAIL ON ITS CLAIMS FOR MISAPPROPRIATION OF TRADE SECRETS ................................ 17

          4.     MXR WILL PREVAIL ON ITS CLAIM FOR UNFAIR COMPETITION ..................................................................... 20

          5.     MXR WILL PREVAIL ON ITS CLAIM FOR TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS ............................ 21

          6.     MXR WILL PREVAIL ON ITS CLAIM FOR BREACH OF THE DUTY OF LOYALTY ........................................................ 23

          7.     DEFENDANTS' ARGUMENT THAT MXR RELEASED ITS CLAIMS IS MERITLESS ........................................................ 24

     B.     ZAVAGNO WILL NOT PREVAIL ON HIS SOLE COUNTERCLAIM FOR BREACH OF CONTRACT .................................................................... 27

IV.     LIST OF PROPOSED WITNESSES ......................................................................... 31

V.     INDEX OF PROPOSED EXHIBITS ......................................................................... 32

VI.     DISCUSSION OF ANY EVIDENTIARY ISSUES LIKELY TO ARISE AT TRIAL................................................................................................................. 32

VII.     ANY PROPOSED VOIR DIRE QUESTIONS ................................................................. 32

VIII.     PROPOSED JURY INSTRUCTIONS ......................................................................... 33

IX.     CONCLUSION.............................................................................................. 33

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A & B Abell Elevator Co., Inc. v. Columbus/ Cent. Ohio Bldg. & Constr. Trades Council*,
73 Ohio St. 3d 1, 651 N.E.2d 1283 (1995) ...............................................................21

*Allen v. R.G. Indus. Supply*,
1993-Ohio-43, 66 Ohio St. 3d 229, 231, 611 N.E.2d 794, 797...................................29

*Bauman v. Worley*,
166 Ohio St. 471 (1957)..............................................................................................30

*State ex rel. Besser v. Ohio State Univ.*,
732 N.E.2d 373 (Ohio Ct. App. 2000).........................................................................19

*Brookeside Ambulance, Inc. v. Walker Ambulance Serv.*,
112 Ohio App.3d 150, 678 N.E.2d 248 (1996)............................................................21

*Byers DiPaola LLC v. Portage Cty. Commrs.*,
41 N.E.3d 89 (Ohio Ct. App. 2015).......................................................................15, 29

*Cheryl & Co. v. Krueger*,
536 F. Supp. 3d 182 (S.D. Ohio 2021) ........................................................................23

*Columbus Finance, Inc. v. Howard*,
42 Ohio St.2d 178 (1975)......................................................................................22, 23

*Coma Ins. Agency v. Safeco Ins. Co.*,
526 F. App'x 465 (6th Cir. 2013) ................................................................................25

*Connelly v. Balkwill*,
116 N.E.2d 701 (Ohio 1954)........................................................................................23

*Davis & Tatera, Inc. v. Gray-Syracuse, Inc.*,
796 F. Supp. 1078 (S.D. Ohio 1992) .....................................................................30, 31

*Equity Resources, Inc. v. Thoman*,
682 F. Supp. 3d 707 (S.D. Ohio 2023) ........................................................................17

*Garb-Ko, Inc. v. Benderson*,
2013-Ohio-1249 (Ohio Ct. App. 2013).........................................................................16

*Gartrell v. Gartrell*,
908 N.E.2d 1019 (Ohio Ct. App. 2009)........................................................................28

iv

*Glidden Co. v. Lumbermens Mut. Cas. Co.*,
   112 Ohio St.3d 470 (2006)......................................................................................29

*Graham v. Drydock Coal Co.*,
   76 Ohio St. 3d 311, 667 N.E.2d 949 (1996) ...........................................................25

*H & M Servs., LLC v. All. Inventory Serv., LLC*,
   No. 2:23-CV-02822, 2025 WL 860371 (S.D. Ohio Mar. 19, 2025)........................25

*Henry Furnace Co. v. Kappelman*,
   91 Ohio App. 451, 108 N.E.2d 839 (1952)..............................................................20

*Hoke v. Marcis*,
   127 N.E.2d 54 (Ohio Ct. App. 1955).......................................................................30

*Hoover Transp. Servs., Inc. v. Frye*,
   77 F. App'x 776 (6th Cir. 2003)..............................................................................18

*Integrity Express Logistics, LLC v. Grgurich*,
   No. 1:23-CV-581, 2025 WL 905629 (S.D. Ohio Mar. 25, 2025)...........................24

*Kademian v. Marger*,
   2012-Ohio-962.........................................................................................................21

*Karabin v. State Auto. Mut. Ins. Co.*,
   10 Ohio St. 3d 163, 462 N.E.2d 403 (1984) ...........................................................25

*Kehoe Component Sales Inc. v. Best Lighting Prods., Inc.*,
   933 F. Supp. 2d 974 (S.D. Ohio 2013) ....................................................................21

*Kent State Univ. v. Hannam*,
   2019-Ohio-2971.......................................................................................................26

*Key Realty, Ltd. v. Hall*,
   2021-Ohio-1868, 173 N.E.3d 831, *aff'd*, 2022-Ohio-1199, 167 Ohio St. 3d
   152, 189 N.E.3d 785 ................................................................................................23

*KN Excavation LLC v. Rockmill Brewery, LLC*,
   196 N.E.3d 916 (Ohio Ct. App. 2022)...............................................................16, 17

*Kubala v. Smith*,
   2023-Ohio-991, 211 N.E.3d 1247............................................................................26

*Landskroner v. Landskroner*,
   154 Ohio App.3d 471, 2003-Ohio-4945, 797 N.E.2d 1002.....................................20

*Marrow v. SSOE, Inc.*,
   599 F. Supp. 3d 593 (N.D. Ohio 2022).....................................................................25

*Marshall v. Beach*,
143 Ohio App. 3d 432, 758 N.E.2d 247 (2001)........................................................................28

*Microsoft Corp. v. Action Software*,
136 F. Supp. 2d 735 (N.D. Ohio 2001)..................................................................................20

*O'Keeffe v. Cenlar Agency, Inc.*,
No. 2:22-CV-4070, 2024 WL 4266018 (S.D. Ohio Sept. 23, 2024) .....................................28

*Orbit Elecs., Inc. v. Helm Instrument Co.*,
855 N.E.2d 91 (Ohio 2006)....................................................................................................23

*Pollard v. Elber*,
123 N.E.3d 359 (Ohio Ct. App. 2018) ...................................................................................29

*Presidio, Inc. v. People Driven Tech., Inc.*,
686 F. Supp. 3d 652 (S.D. Ohio 2023) ..................................................................................17

*Robinette v. PNC Bank*,
2016-Ohio-767 (Ohio Ct. App. 2016).....................................................................................17

*State ex rel. The Plain Dealer v. Ohio Dept. of Ins.*,
80 Ohio St. 3d 513 (Ohio 1997).............................................................................................19

*Union Sq. Realty, Inc. v. Golfers & Hackers, Inc.*,
2011-Ohio-1882 ......................................................................................................................30

*Univ. of Akron v. Ohio Dep't of Job & Fam. Servs.*,
2009-Ohio-3172 ......................................................................................................................26

*Upper Valley Realty, Inc. v. Hanson*,
2006-Ohio-314 ........................................................................................................................30

*Ventas, Inc. v. HCP, Inc.*,
647 F.3d 291 (6th Cir.2011) ...................................................................................................21

*Vincent v. Weber*,
13 Ohio Misc. 280, 232 N.E.2d 671 (Mun. 1965) .................................................................31

*William Kehoe Assoc. v. Indiana Tube Corp.*,
891 F.2d 293 (6th Cir.1989) ...................................................................................................31

**Statutes**

18 U.S.C. § 1836, et seq.........................................................................................................17

O.R.C. 2305.06 .......................................................................................................................31

O.R.C. § 1333.61(A)...............................................................................................................18

vi

O.R.C. § 1333.61(B) ........................................................................................................................18

O.R.C. § 1333.61(D) ........................................................................................................................18

O.R.C. § 1333.63(A) ...................................................................................................................19, 20

O.R.C. § 1333.63(B) ........................................................................................................................20

O.R.C. § 1333.64(C) ........................................................................................................................20

**Other Authorities**

88 OH Jur.3d Trade Regulation § 66 (1989) ....................................................................................20

## I.     INTRODUCTION

In 2017, Plaintiff MXR Imaging, Inc. ("MXR") paid millions of dollars to purchase from Defendant David Zavagno ("Zavagno") substantially all of the assets of Universal Medical Systems, Inc. ("UMS"), including its trade names and associated goodwill. MXR then permitted Zavagno to remain employed with what became MXR's "Universal Medical Systems" division.

In flagrant breach of the restrictive covenants contained in the agreements, Zavagno exploited this opportunity to, in effect, deprive MXR of the benefit of its bargain, while profiting from (1) the millions of dollars that MXR paid to purchase his business, (2) his employment with MXR, *and* (3) the substantial earnings obtained through competing with MXR when—in his words—he "worked at both" MXR and Defendant Universal Systems Diagnostics, Inc. ("USD," and together with Zavagno, the "Defendants")—the entity through which he surreptitiously continued to operate the business that he had sold to MXR.

Over the past several years, and while employed with MXR, Zavagno, individually and through USD, directly competed with MXR, eviscerating the purpose of the multi-million dollar asset purchase by, among other things: (i) selling magnetic resonance imaging ("MRI") and computed tomography ("CT") machines directly to MXR customers—customer relationships MXR bought from UMS back in September 2017, (ii) entering into agreements with Siemens to sell CT/MRI machines directly to MXR customers; (iii) utilizing MXR's confidential customer lists, sales, pricing, and related information to undercut MXR; (iv) impeding MXR's ability to enter into its own agreement with Siemens; (v) soliciting MXR customers; and (vi) registering the "Universal Medical Systems" trade name—which MXR purchased as part of the 2017 asset purchase—a week after MXR filed this lawsuit. By 2024, the asset purchase was not worth the paper on which it was written.

After MXR discovered the extent of Zavagno's unlawful competition and breach of the restrictive covenants and demanded that he immediately cease and desist from all unlawful activities against MXR, Zavagno contrived demonstrable misrepresentations and flimsy excuses to justify his misconduct, forcing MXR to file this lawsuit.

Straining for leverage, Zavagno responded with counterclaims against MXR for an "accounting," tortious interference with business relations, and breach of contract. The Court rightfully dismissed Zavagno's "accounting" and tortious interference counterclaims. His claim for breach of contract is equally meritless, as it relies purely on speculation and conjecture rather than the express terms of the agreements Zavagno entered into with MXR.

Zavagno simply cannot meet his burden of proving that MXR breached its agreements with Zavagno or that Zavagno suffered any damages at all. *First*, Zavagno has received payment of all commissions to which he is legally entitled. *Second*, MXR conducted an exhaustive audit of data sources—including data independently prepared by third party original equipment manufacturers ("OEMs")—to determine the amount of commissions owed to Zavagno, prepared a commission schedule that includes updates and reconciliation of payments through February 25, 2026, and tendered a check in that amount to Zavagno. Zavagno has refused to accept that payment, yet he cannot identify a single transaction that was omitted from the schedule that MXR presented to him.

## II.    STATEMENT OF FACTS

**A.    Defendants Actively Competed Against MXR, Eviscerating the Purpose of MXR's Multi-Million Dollar Purchase of Zavagno's Prior Business.**

**1.    MXR's Multi-Million Dollar Purchase of UMS's Assets.**

MXR is engaged in the business of selling, distributing, and servicing medical imaging equipment and supplies, including CT and MRI systems. On or about September 28, 2017, MXR and UMS, which was then wholly owned by Zavagno, entered into an Asset Purchase Agreement

2

("APA") by and among UMS ("Seller"), David Zavagno ("Owner"), and Merry X-Ray Chemical Corp. ("Buyer"). Under the APA, MXR purchased substantially all of the assets of UMS and its business; the selling, marketing, and/or providing of MRI or CT equipment or other MRI or CT scanning or customized computed tomography solutions; and related products and services conducted by Zavagno's then-company, UMS.

The assets that MXR purchased included customer lists, price lists and vendor lists and similar items related to UMS's business, its goodwill, and all proprietary rights, including rights in the trade name "Universal Medical Systems." As shown in the Seller Disclosure Schedules, attached to and incorporated into the APA, MXR purchased, among other things: (i) UMS's contractual relationships with OEMs including Esaote, Toshiba, and Siemens; (ii) dozens of open orders and service agreements between UMS and BluePearl, which joined Mars Veterinary Health in 2015; and (iii) hundreds of open orders, quotes, and service contracts with OEMs and customers in the veterinary space. These OEM and customer relationships were assigned to MXR through the General Assignment and Bill of Sale, contemporaneously executed on September 28, 2017.

Pursuant to the APA, MXR paid—and Zavagno received—$3,745,000, in addition to adjustments to be made for assets identified in the APA. Zavagno was the sole recipient of the purchase price.

To protect MXR's multi-million-dollar investment in the assets purchased from Zavagno, the APA contained robust non-compete, non-solicit, and confidentiality restrictive covenants that Zavagno and UMS—and USD, as its corporate successor—agreed to be bound by. Defendants agreed and acknowledged that these covenants were necessary to protect MXR's interest in, and value of, the business and the purchased assets (including the goodwill inherent therein) and that MXR would not have consummated the transactions contemplated in the APA without these

3

restrictions. The APA contains a tolling provision, under which Zavagno and USD acknowledged and agreed that, in the event of any violation of the restrictive covenants in the APA, the post-termination restrictions would be extended by a period of time equal to the period of such violation.

**2.  MXR Chooses Not to Purchase UMS's Unsalable Inventory Due to Lack of Value.**

Following MXR's acquisition of UMS, MXR allowed Zavagno to retain certain specified systems and sell them on his own (the "Excluded Systems"). As part of MXR's due diligence leading up to the APA, these Excluded Systems were determined to be *unsalable* inventory over 90 days old with little to no value. Importantly, these Excluded Systems were a *limited, defined* set of systems Zavagno retained for sale. Nothing in the APA authorized Zavagno to sell products to MXR's customers through USD by improperly competing and undercutting MXR, while continuing to enjoy the benefits of his employment with MXR.

**3.  Zavagno Agrees to Robust Restrictive Covenants in the Employment Agreement.**

In addition to paying Zavagno millions of dollars for purchasing UMS, MXR extended to Zavagno the opportunity to remain employed by MXR for a three-year term expiring on September 28, 2020. Zavagno accepted MXR's offer and executed an Employment Agreement, receiving a base salary of $150,000 per year.

In the Employment Agreement, Zavagno agreed to multiple additional confidentiality, non-competition, non-solicitation, and non-disparagement covenants, all of which survive the termination of his employment with MXR for a 24-month period. The Employment Agreement contains a tolling provision, under which Zavagno acknowledged and agreed that, in the event of any violation of the restrictive covenants in the Employment Agreement, the post-termination restrictions would be extended by a period of time equal to the period of such violation.

**4.  Zavagno Immediately Breaches the APA By Operating a Competing Business.**

On September 29, 2017, the *day after* the effective date of the APA, Zavagno amended UMS's articles of incorporation, changing the name of the corporation to Universal Systems Diagnostics, Inc. Zavagno has continued to, in effect, operate MXR-purchased UMS under the guise of USD—in direct violation of the APA—to compete with MXR.

Later, on August 1, 2024, a mere *week* after MXR filed this lawsuit, Defendants—with Zavagno's authorization as USD's President—registered the trade name "Universal Medical Systems" with the Ohio Secretary of State, stating that the general nature of the business was the "[s]ale, purchase, service and repair of imaging equipment." Defendants' registration of the trade name "Universal Medical Systems" is in flagrant breach of the APA, in which MXR purchased *all* "Business Proprietary Rights" including all proprietary rights in the name "Universal Medical Systems." The registration of this trade name is part and parcel of Zavagno's conduct to upend the purpose of the APA, such that Zavagno could continue to operate UMS surreptitiously through USD.

**5.  MXR Purchases UMS's Dealership Agreement with Siemens, Which Is Later Terminated After MXR, at Its Own Cost, Fixes Siemens' Installation Issues at BluePearl Vet Locations.**

Before the APA, UMS had a Dealership Agreement with Siemens dated March 1, 2017 (the "Dealership Agreement"). Like all other dealership agreements between UMS and OEMs, MXR purchased this Dealership Agreement under the APA. After the APA, UMS, now an MXR division, and Siemens entered into a Base Distribution Addendum ("Addendum") to the Dealership Agreement on June 15, 2018. Under the Dealership Agreement and Addendum, UMS, was appointed a dealer for the sale of Siemens products.

Later, Siemens failed two installations for an MXR customer, BluePearl, which was causing major problems at the customer's sites. Ultimately, MXR—to preserve the relationship

with both Siemens and BluePearl, and on its own dime—took immediate action to remedy the situation for BluePearl. Despite MXR fixing Siemens' installation issues at the BluePearl locations, Siemens terminated the Dealership Agreement on September 6, 2019.

**6.      Defendants Enter Into Agreements With OEMs to Compete with MXR.**

On February 13, 2020, Zavagno emailed a Siemens representative requesting a written quote to sell a Siemens product. Zavagno was advised by Siemens that he needed to be set up as a reseller, and as such, Siemens needed to re-establish the contract it had, *i.e.*, the Dealership Agreement. Despite MXR purchasing the Dealership Agreement with Siemens, Zavagno did not re-establish the contract between Siemens and *MXR*, instead establishing a contract between Siemens and *USD*.

On or about May 15, 2020, USD entered into a Distributorship Agreement with Siemens, whereby USD was appointed as a non-exclusive distributor to facilitate the sale of Siemens products throughout the United States. By entering into the Distributorship Agreement, USD, and by extension Zavagno: (i) agreed to provide all leads, including prospective sales possibilities, to Siemens; (ii) entered into binding non-competes, prohibiting USD from directly or indirectly competing with Siemens; and (iii) would receive commissions from the sale of said Siemens products. The Siemens products USD was appointed as agent to sell were not Excluded Systems, meaning they were *not* one of the few pieces of unsalable, pre-existing UMS inventory that Zavagno retained following execution of the APA. Defendants facilitated orders under the Distributorship Agreement.

Beyond directly competing with MXR, Defendants disclosed confidential information Zavagno obtained through his employment at MXR—to MXR's (and its OEMs') detriment and Defendants' advantage. On April 1, 2021, Siemens issued a cease-and-desist letter to Zavagno, admonishing him for disclosing a competitor's price payment terms for Canon's—another

6

OEM's—AQ 64 system. Zavagno obtained this confidential information during his employment at MXR, as MXR sells Canon AQ 64 systems pursuant to MXR's distribution agreement with Canon.

Siemens later wanted Defendants to sell their products specifically in the vet space—the exact space MXR purchased Zavagno and UMS's customer and OEM relationships from. In discussions leading to this agreement, on June 21, 2021, Zavagno emailed Siemens director Philip Martin, stating "***Everyone has understood where our loyalty rests.***"

To facilitate these sales of Siemens products, Defendants entered into an Agency Agreement with Siemens on or about August 19, 2021. In the Agency Agreement, Zavagno (through USD): (i) was appointed as a non-exclusive agent to sell Siemens products throughout the United States; (ii) agreed to turn over all leads in the vet space to Siemens; and (iii) received commissions from the sale of Siemens products. Defendants and Siemens entered into an Amendment No. 1 to the Agency Agreement on or about September 13, 2023, extending the term of the Agency Agreement through July 31, 2024, which would automatically renew unless Siemens or Defendants issued a termination letter.

Defendants similarly entered into an Agency Agreement with Siemens on or about July 14, 2022, whereby Defendants were appointed as a non-exclusive agent to sell both new and refurbished Siemens products throughout Canada. On or about March 20, 2023, Defendants and Siemens entered into an Amendment to the Agency Agreement, amending (i) the commission structure, and (ii) the contractual product line for Defendants' sale as Siemens' agent in Canada.

Defendants also entered into a dealership or distributorship agreement with another OEM, Canon. MXR has its own distribution agreement with Canon, which Zavagno was aware of, given

7

that his work at MXR focused on selling Canon CTs, so much so it was his proverbial "bread and butter."

Further, while employed at MXR, Zavagno began diverting MXR business to third-party CT seller UMS Solutions, Inc. dba Universal Imaging, Inc ("Universal Imaging"). Zavagno assisted Universal Imaging in the sales of Canon CT products directly to MXR customers, all the while seeking to cut out MXR completely from an agreed-upon commission split for sales jointly made between Universal Imaging and Zavagno. Zavagno, individually and through USD, was setting Universal Imaging up to be an MXR competitor that Zavagno could work through following the termination of his employment with MXR, despite the restrictive covenants in his Employment Agreement surviving for 24 months following his termination date.

Zavagno did not disclose the existence of any of these agreements to MXR.

**7.  Defendants Compete with MXR By Selling Directly to MXR Customers.**

Defendants sold numerous Siemens products directly to MXR customers—including MXR customers where MXR had active, open opportunities for potential sales. Siemens, with Defendants' assistance, issued dozens of quotes to MXR customers for CT/MRI machines with accompanying service contracts. Far from an isolated instance, Defendants assisted Siemens with the sale of CT/MRI machines to BluePearl—an MXR customer—as distributors for Siemens. To MXR's detriment, Zavagno utilized the information he obtained through his employment at MXR to facilitate those sales, undercutting MXR so the sale would be made through Siemens, not MXR.

Moreover, mindful of Defendants' contractual obligations with Siemens, Zavagno sent Siemens leads for prospective sales. Zavagno, by virtue of his employment at MXR, would receive requests for proposals from potential and actual customers in the vet space, and Zavagno would send those leads to Siemens, inviting Siemens' competition with MXR for these same opportunities.

Defendants were compensated for each Siemens sale. MXR, however, was not, despite BluePearl being an MXR customer. USD's accountant, Kenneth Steele, invoiced Siemens for each sale procured by Defendants on Siemens' behalf for the commissions due to Zavagno. Each invoice that Defendants submitted to Siemens was pursuant to the "Agency Agreement," and the commissions quoted match the percentage contemplated in the Agency Agreement.

Defendants' conduct, however, did not stop with just the sale of Siemens products. Defendants also sold non-Excluded Systems, including but not limited to specialty equipment and even Canon products directly to MXR customers; again, without MXR receiving any renumeration from these sales.

### 8.     Zavagno Sabotages MXR's Negotiations with Siemens.

After Siemens terminated the Dealership Agreement in 2019, MXR sought, through Zavagno, to facilitate discussions on reestablishing a relationship. However, because Zavagno (through USD) had active agreements with Siemens at this time, Zavagno actively sabotaged MXR's attempts.

Knowing he was the middle man between MXR and Siemens and as such could control the flow of information between businesses, Zavagno repeatedly gave MXR's CFO—who consistently asked for updates regarding the sales Zavagno had "been currently working with Siemens in some capacity with some of [MXR's] customers" so he could "understand more about that activity"—the demonstrably false assertion that Siemens had "no desire to enter in to [sic] any distribution agreements with anyone at this point"—despite Zavagno, through USD, having those *exact* agreements in place at the time of these assertions.

Further lying to MXR to lull it into a false sense of security, Zavagno informed MXR's CFO that MXR would be "paid 7% of the sales price" for deals Zavagno assisted Siemens with that were sold to MXR customers, and that Zavagno would get MXR that money based on a

9

purported "verbal agreement" between MXR and Siemens. MXR was, of course, never paid on these Siemens sales, because there was no "verbal agreement" in place. Despite MXR CFO's attempts, Zavagno never provided him with, as repeatedly requested, "something in writing or an email agreeing to this 7%" sales commission. Rather, Defendants—and Defendants alone—were compensated for Zavagno's competitive conduct.

### 9. Zavagno Conceals His Unlawful Competition.

Beyond hindering MXR's attempts to renew its agreements with Siemens, Zavagno concealed any reference to Defendants' competitive business dealings. Indeed, Zavagno would, among other things: (i) email Defendants' accountant Kenneth Steele to immediately get USD work "off" of MXR's screen; (ii) email MXR clients about his competitive conduct in "strict confidence;" (iii) have his administrative assistant—who was an MXR employee—facilitate USD business through her personal email account instead of her MXR-owned and supervised account; and (iv) attempt to get Defendants and their business partner, Universal Imaging, Inc., paid directly from OEMs without MXR involvement.

### 10. Zavagno Executes the Separation Agreement, and MXR Preserves Its Claims Against Zavagno Prior to the Termination Date.

On February 15, 2024, MXR and Zavagno executed the Transition and Separation Agreement & Release ("Separation Agreement"). The Separation Agreement provided that Zavagno's employment would terminate on May 31, 2024. While the Separation Agreement contained a "Release" term—which, notably, applied *solely* to claims regarding Zavagno's employment at MXR and the termination of said employment—the parties identified a carve out in the "No Claims" section of the Separation Agreement, carving out from the release any claims raised in writing, and in reasonable detail, prior to Zavagno's termination date of May 31, 2024.

10

On May 10, 2024, MXR, through its counsel, did just that, raising its claims in reasonable detail and in writing prior to the Termination date, preserving its claims against Zavagno for his then-known conduct in violation of the parties' agreements (the "Claim-Notice Letter"). In the Claim-Notice Letter, MXR described in reasonable detail the facts MXR had learned—as of May 14, 2024—that formed the basis of its claims against Zavagno: that Zavagno sold MRI equipment directly to MXR customers without involving or compensating MXR and that Zavagno's conduct was to MXR's detriment.

**B.** **MXR Paid, and Tendered Payment of, All Commissions Due to Zavagno Under MXR's Commission Plan.**

**1.** **Zavagno's At-Will Employment with MXR and MXR's Commission Plan.**

On October 12, 2020, after the expiration of the three-year Employment Agreement term, MXR offered Zavagno continued at-will employment as President of the Universal Medical Systems division (the "Employment Letter"). Zavagno executed the Employment Letter on November 15, 2020.

On or about July 18, 2023, Zavagno executed MXR's Commission Plan effective from July 2023 through December 31, 2023 (the "2023 Commission Plan"). The 2023 Commission Plan specified commission rates of 18% for CT equipment and 14.5% for MRI equipment, calculated as a percentage of gross margin. With respect to service contracts, the 2023 Commission Plan limited eligibility for service *provided by MXR*. The 2023 Commission Plan provided that commissions were earned when a sale was "Recognized" as defined in the Plan, which, at a minimum, required the sale to be subject to a binding purchase agreement or sales order as of the date of Zavagno's termination and when MXR receives payment of such.

While Zavagno now offers a theory that he is entitled to commissions for all sales to "all of" MXR's "national accounts," this claim is grounded in neither law or fact, and instead relies on

11

a fundamental misunderstanding of what an MXR national account is. MXR national accounts are accounts that already exist at MXR and are not the result of any single, sales representative's efforts. Indeed, when MXR entered into the APA with Zavagno for substantially all of the assets of UMS, it paid close to $4 million *for* certain national accounts to ensure that MXR would no longer have to compete with UMS on those accounts. Further, communications between the parties confirm that those national accounts purchased by MXR may be "managed by," but not commissionable to, Zavagno.

National account sales not being commissionable to Zavagno is consistent with the terms of the agreements Zavagno had in place with MXR. Neither the Employment Letter nor the 2023 Commission Plan provide that Zavagno is entitled to commissions as a matter of course for all national accounts, or even refers to commissions on national accounts. To the contrary, Appendix A to the Commission Plan only provides a schedule for payment of commissions on CT and MRI equipment and leases as described above. It does not refer to national accounts at all; in fact, the only tangential reference to national accounts in the Commission Plan is merely a job code for "National Sales Mgr." Thus, the fundamental underpinning on which Zavagno relies is that he is somehow entitled to commissions on all national accounts is not set forth in any written agreement, and Zavagno points to none. Further, far from "all" national accounts being assigned to Zavagno, *Zavagno himself* identified only five (5) specific national accounts that were assigned to him in a sales list circulated to MXR's sales team.

**2.    Zavagno and MXR Enter Into Two Offset Agreements and a Third Reconciliation on Amount Owed to Zavagno.**

In July 2019, MXR and Zavagno, who worked through his accountant John Zalick, engaged in a true-up process where the parties ultimately agreed that each owed certain sums of money to the other. The parties reached an "agreed accounting" of certain commissions owed to

12

Zavagno as of June 30, 2019. Because the amount Zavagno owed MXR exceeded these commissions, the parties agreed that, following the offset or rollup agreement, Zavagno's future earned commissions would offset the amount owed by Zavagno to MXR. Zavagno further agreed that he would not be entitled to, among other things, any commissions, of any kind or nature, for the Commission Period, *i.e.*, through June 30, 2019, or otherwise.

On February 18, 2021, MXR and Zavagno, who again was working through his accountant John Zalick, engaged in another rollup process where the parties agreed that Zavagno owed to MXR $61,736.25, which Zavagno authorized MXR to offset against all commissions owed to him at that time. Thereafter, MXR paid the commissions owed to Zavagno, which MXR cooperatively calculated with Zavagno's accountant, through September 30, 2020.

In 2023, Zavagno once again claimed that he was entitled to more commissions, and MXR's VP of Finance, Effie Fryer—as she has done previously for Zavagno—went through a very time-consuming process to resolve Zavagno's concerns. As a result of that thorough audit, MXR determined that Zavagno was owed $73,029.90, which was paid to Mr. Zavagno, and Zavagno accepted payment in satisfaction of the amount of commissions due him.

### 3.      Zavagno Executes the Separation Agreement.

On February 15, 2024, MXR and Zavagno entered into the Separation Agreement. The Separation Agreement provided that Zavagno's employment would terminate on May 31, 2024, and governed the calculation and payment of post-termination commissions.

Under the Separation Agreement, commissions for post-termination periods were based on sales that were recognized—a sale for which a binding purchase agreement or sales order exists as of the termination date, regardless of payment timing—as of the termination date. The Separation Agreement further provided that commissions for recognized sales would be paid within 30 days after MXR received payment from the customer. Significantly, the Separation Agreement

13

contemplated that, after Zavagno's retirement date, Zavagno would continue to engage in activities for the benefit of MXR, for which he would be paid commission. For the explicit purpose of facilitating those post-termination activities, MXR agreed to allow him to utilize his MXR-owned email address for post-termination transactions. Zavagno never performed these contemplated activities for the benefit of MXR, and instead continued his competition with MXR through USD in flagrant breach of the restrictive covenants in the Employment Agreement, which survived for 24 months following the termination of Zavagno's employment.

4. **MXR Performs a Comprehensive Audit of Commissions That May be Owed to Zavagno.**

In February 2026, Effie Fryer, MXR's Vice President of Finance, prepared a comprehensive commission schedule dated February 25, 2026 (the "Commission Schedule"). The Commission Schedule was compiled using multiple data sources, including independent, third party Canon commission schedules and NXC Imaging data, Salesforce records, national accounts data, and internal reconciliations. To prepare the Commission Schedule, Ms. Fryer went out of her way to see if there was any equipment that was sold that Zavagno would get a commission on, or any service agreements that he would get a commission on, and what she prepared includes everything that he had sold and for which he should have been paid a commission. The Commission Schedule shows a net amount due of $122,212 in commissions remaining due to Zavagno as of February 25, 2026, after accounting for gross commissions earned, clawbacks and adjustments, and payments already made.

MXR tendered the $122,212 commission payment to Zavagno, which he rejected.

14

### III.      DISCUSSION OF THE CONTROLLING LAW

**A.      MXR Will Prevail On Its Claims at Trial**

**1.      MXR Will Prevail On Its Breach of Contract Claims**

To establish a claim for breach of contract under Ohio law, MXR must prove "(1) the existence of a contract; (2) performance by [MXR]; (3) breach by [Zavagno]; and (4) damages." *Byers DiPaola LLC v. Portage Cty. Commrs.*, 41 N.E.3d 89, 94 (Ohio Ct. App. 2015).

**a.      Breach of the Employment Agreement**

MXR will prevail on its breach of contract claim for breach of the Employment Agreement against Zavagno.  It is undisputed that the Employment Agreement is a valid agreement between MXR and Zavagno.  Based on the facts set forth above, MXR will prove at trial that Zavagno breached the Employment Agreement by (i) competing with MXR during his employment with MXR and while the Employment Agreement was in effect, including, without limitation, by entering into agreements with Siemens and Canon for the benefit of Defendants; (ii) using and disclosing MXR's confidential information, including to compete with and undercut MXR; (iii) soliciting MXR's customers; and (iv) disparaging MXR.

MXR has suffered damages as the result of Zavagno's breaches, including through lost business and profits.  MXR will present evidence at trial, including through its proffered damages expert, Sean Saari, that MXR is entitled to damages of at least $2.27 million.

Because Zavagno breached the Employment Agreement, pursuant to its terms, MXR is also entitled to (i) an extension of the restrictive covenants therein for the period of time that Zavagno has been in violation thereof; and (ii) an award of attorneys' fees and costs.

**b.      Breach of the APA**

MXR will likewise prevail on its claim for breach of the APA against both Zavagno and USD.  It is undisputed that the APA is a valid agreement between MXR, on the one hand, and

15

Zavagno and UMS (which Zavagno contends is the predecessor of USD), on the other.  Based on the facts set forth above, MXR will prove at trial that Zavagno breached the APA by (i) registering the trade name "Universal Medical Systems" with the Ohio Secretary of State and doing business under that name, despite MXR having purchased all business proprietary rights of UMS, including proprietary rights in the name "Universal Medical Systems," in the APA; (ii) using and disclosing MXR's confidential information, including to compete with and undercut MXR; and (iii) soliciting MXR's customers.

MXR has suffered damages as the result of Zavagno's breaches, including through lost business and profits, which, as set forth above, it will establish through expert testimony at trial.

Because Zavagno breached the APA, pursuant to its terms, MXR is entitled to (i) an extension of the restrictive covenants therein for the period of time that Zavagno has been in breach; and (ii) an award of attorneys' fees and costs.

### 2. MXR Will Prevail on Its Claim for Unjust Enrichment

MXR will prevail on its claim for unjust enrichment against Zavagno.

Under Ohio law, "[t]he doctrine of unjust enrichment 'applies when a benefit is conferred and it would be inequitable to permit the benefitting party to retain the benefit without compensating the conferring party.'" *KN Excavation LLC v. Rockmill Brewery, LLC*, 196 N.E.3d 916, 922 (Ohio Ct. App. 2022) (quoting *Garb-Ko, Inc. v. Benderson*, 2013-Ohio-1249, ¶ 25 (Ohio Ct. App. 2013)).  "The purpose of an unjust enrichment claim is not to compensate the plaintiff for loss or damage suffered by the plaintiff, but to enable the plaintiff to recover the benefit he conferred on the defendant when it would be unjust for the defendant to retain the benefit." *Id*. (internal citation omitted).  "The elements of an unjust enrichment claim are: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant knew of the benefit; and (3) it would be unjust to allow the defendant to retain the benefit without payment to the plaintiff." *Id*.

16

(citing *Robinette v. PNC Bank*, 2016-Ohio-767, ¶ 23 (Ohio Ct. App. 2016)).  The damages for unjust enrichment are "the amount the defendant benefited," and "[u]njust enrichment entitles a party only to restitution of the reasonable value of the benefit conferred."  *Id*. at 923 (internal citations omitted).

At trial, MXR will prove that Zavagno was unjustly enriched by improperly competing with MXR.  Specifically, MXR will demonstrate that it conferred a benefit on Zavagno by purchasing his business (UMS) for millions of dollars, employing him, and paying him, among other consideration, commissions based on sales he procured.  Zavagno voluntarily accepted and retained the compensation (including commissions) paid to him by MXR.  But then Zavagno was unjustly enriched by failing to involve and/or compensate MXR in the sale of Siemens and other products to MXR's customers.  It would be inequitable for Zavagno to retain the benefit of the compensation (including commissions) paid to him by MXR without just compensation to MXR.  As a result, Zavagno should be required to compensate MXR for his sale of Siemens and other products to MXR's customers in which he did not involve and/or compensate MXR.

### 3.      MXR Will Prevail on Its Claims for Misappropriation of Trade Secrets

MXR will prevail on its claims for misappropriation of trade secrets against Zavagno under both the federal Defend Trade Secrets Act of 2016 and the Ohio Uniform Trade Secrets Act ("OUTSA") against Zavagno.[1]  In order to succeed on its misappropriation of trade secrets claim, MXR "must show by a preponderance of the evidence (1) the existence of a trade secret[;] (2)

---

[1] Although MXR brings claims under both the federal Defend Trade Secrets Act of 2016 and the Ohio Uniform Trade Secrets Act, "[p]roof of trade secret misappropriation under either the federal DTSA or the state law OUTSA requires similar elements."  *See Presidio, Inc. v. People Driven Tech., Inc.*, 686 F. Supp. 3d 652, 682 (S.D. Ohio 2023); *see also Equity Resources, Inc. v. Thoman*, 682 F. Supp. 3d 707, 726 (S.D. Ohio 2023) ("Courts consider these state and federal law claims together because the definition and requirements of the OUTSA and DTSA are essentially the same.").

17

acquisition of a trade secret as a result of a confidential relationship; and (3) unauthorized use of a trade secret." *Hoover Transp. Servs., Inc. v. Frye*, 77 F. App'x 776, 782 (6th Cir. 2003).

The OUTSA defines a trade secret as follows:

"Trade secret" means information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
(1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

O.R.C. § 1333.61(D). "Misappropriation" means "[d]isclosure or use of a trade secret of another without the express or implied consent of the other person by a person who . . . [a]t the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret . . . was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use . . . ." O.R.C. § 1333.61(B). "Improper means" includes the "breach of a duty to maintain secrecy" of the trade secret. O.R.C. § 1333.61(A).

Ohio courts consider the following factors when analyzing if information is a trade secret: "(1) [t]he extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, *i.e.*, by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information." *State ex rel. The Plain Dealer v. Ohio Dept. of Ins.*, 80 Ohio St. 3d 513, 524-25 (Ohio 1997) (citing *Pyromatics, Inc. v. Petruziello*, 7 Ohio App.3d 131, 134–135, 454 N.E.2d 588, 592 (Ohio Ct. App. 1983)). "In addition, a record

18

is entitled to trade secret status 'only if the information is not generally known or readily ascertainable to the public.'" *State ex rel. Besser v. Ohio State Univ.*, 732 N.E.2d 373, 379 (Ohio Ct. App. 2000) (quoting *State ex rel. Lucas Cty. Bd. of Commrs. v. Ohio Environmental Protection Agency*, 88 Ohio St.3d 166, 173 (Ohio 2000)).

At trial, MXR will prove that Zavagno misappropriated its trade secrets—including customer lists; supply lists; customer pricing information (including information regarding sales margins); MXR business templates and quote sheets; strategic sales methods/processes; workflow procedures; and business strategies—and used these trade secrets to improperly compete with MXR while he was still employed by MXR. MXR will demonstrate through testimony and other evidence that MXR's trade secrets are not generally known, that MXR guards the secrecy of its trade secret information, and there is significant value and economic advantage to MXR in having exclusive possession of its trade secret information. In fact, Zavagno only had access to MXR's trade secrets by virtue of his employment with MXR and had a duty to maintain their confidentiality. Not only did Zavagno breach that duty by using the trade secrets in order to divert business away from MXR and to himself/USD, but he also wrongfully disclosed them to third parties, further damaging MXR.

Damages for misappropriation of trade secrets "may include both the actual loss caused by [the] misappropriation and the unjust enrichment caused by [the] misappropriation that is not taken into account in computing actual loss." O.R.C. § 1333.63(A). "If willful and malicious misappropriation exists, the court may award punitive or exemplary damages in an amount not exceeding three times any award made under [O.R.C. § 1333.63(A)]." O.R.C. § 1333.63(B). The court may also award "reasonable attorney's fees" for "willful and malicious misappropriation." O.R.C. § 1333.64(C). In addition to MXR's lost profits caused by the misappropriation (which

19

reflect MXR's "actual loss"), MXR is also entitled to punitive damages and attorneys' fees because it will demonstrate that Zavagno's conduct was willful and malicious.

### 4. MXR Will Prevail on Its Claim for Unfair Competition

MXR will prevail on its claim for unfair competition against Zavagno and USD. While unfair competition "is commonly defined in terms of the doctrine that no one may sell his goods as those of another, it has come to develop a broader connotation in recent years and so may consist of unethical business practices not necessarily amounting to the passing off of goods or services." *Microsoft Corp. v. Action Software*, 136 F. Supp. 2d 735, 740 (N.D. Ohio 2001) (quoting 88 OH Jur.3d Trade Regulation § 66 (1989)). Indeed, unfair competition also extends to any unfair commercial practice designed to harm the business of another. *Landskroner v. Landskroner*, 154 Ohio App.3d 471, 490-91, 2003-Ohio-4945, 797 N.E.2d 1002; *see also Henry Furnace Co. v. Kappelman*, 91 Ohio App. 451, 461-62, 108 N.E.2d 839 (1952) ("[i]n unfair competition proceedings, it is not competition, in and of itself, which concerns the court but the unfair and unscrupulous business tactics involved.").

As set forth above, at trial, MXR will prove that Zavagno and USD unfairly competed with MXR by (i) registering the trade name "Universal Medical Systems" with the Ohio Secretary of State and doing business under that name, despite MXR having purchased all business proprietary rights, including proprietary rights in the name "Universal Medical Systems"; (ii) using and disclosing MXR's confidential information to, among other things, compete with MXR; (iii) interfering with MXR's OEM and customer relationships; and (iv) soliciting MXR's customers. Defendants engaged in these acts with the intent of harming MXR's business to their own benefit.

20

**5.** **MXR Will Prevail on Its Claim for Tortious Interference with Business Relations**

MXR will prevail on its claim for tortious interference with business relations against Zavagno and USD.  Tortious interference with business relations occurs "when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another." *A & B Abell Elevator Co., Inc. v. Columbus/ Cent. Ohio Bldg. & Constr. Trades Council,* 73 Ohio St. 3d 1, 14, 651 N.E.2d 1283 (1995). Under Ohio law, a tortious interference with business relations claim "includes intentional interference with prospective contractual relations, not yet reduced to a contract." *Kademian v. Marger*, 2012-Ohio-962, ¶ 94.

The elements of tortious interference with business relations are: "(1) a business relationship or contract; (2) the wrongdoer's knowledge of the relationship or contract; (3) the wrongdoer's intentional and improper action taken to prevent a contract formation, procure a contractual breach, or terminate a business relationship; (4) a lack of privilege; and (5) resulting damages." *Brookeside Ambulance, Inc. v. Walker Ambulance Serv.,* 112 Ohio App.3d 150, 155–56, 678 N.E.2d 248 (1996) (citing *A & B–Abell,* 73 Ohio St.3d at 14). With regards to the fourth element, lack of privilege, a competitor is prohibited from inducing a third person "not to enter into or continue a business relation with a competitor" by employing "wrongful means ...." *Kehoe Component Sales Inc. v. Best Lighting Prods., Inc.*, 933 F. Supp. 2d 974, 1018 (S.D. Ohio 2013); *Ventas, Inc. v. HCP, Inc.,* 647 F.3d 291, 309–10 (6th Cir.2011) (explaining that, in interpreting the Restatement, § 767 factors[2] relating to improper conduct are useful in considering whether a competitor has employed wrongful means).

---

[2] These factors are: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting

At trial, MXR will prove that it has business relationship with various customers and OEMs—including Siemens, Canon Medical Systems, USA, Inc., Mars Veterinary Health, BluePearl Management, LLC, VCA Animal Hospitals, Inc., Ethos Veterinary Health, and others. As set forth above, MXR will also demonstrate that Zavagno and USD intentionally interfered with these business relationship by, among other things, diverting business opportunities to themselves and such interference was willful and malicious.  Indeed, MXR will prove that Zavagno, while employed at MXR, (i) sabotaged MXR's attempts to renew its contractual agreements with Siemens, and (ii) concealed Defendants' contracts with Siemens and their competitive sales of Siemens products, going so far as to threaten litigation against Siemens for the mere act of sending MXR an invoice. Zavagno—to MXR's detriment—ensured that Defendants, and Defendants alone, could exclusively sell new Siemens.  As such, Defendants tortiously interfered with MXR's business with both an OEM (Siemens) and MXR's customers looking to purchase Siemens equipment.

Because MXR will prevail on this claim, it will be entitled to the damages it suffered as a result of Defendants' intentional interference with its business relationships, including lost profits, which it will prove at trial through expert testimony.  It will also be entitled to awards of punitive damages and attorneys' fees as a result of Defendants' malicious interference.  "It is an established principle of law in [Ohio] that punitive damages may be awarded in tort cases involving fraud, insult or malice." *Columbus Finance, Inc. v. Howard*, 42 Ohio St.2d 178, 183 (1975) (also finding that "[i]f punitive damages are proper, the aggrieved party may also recover reasonable attorney fees").  "Actual  malice" is defined as "that state of mind under which a person's conduct is

---

the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties. Restatement, § 767.

characterized by hatred or ill will, a spirit of revenge, retaliation, or a determination to vent his feelings upon other person." *Id*. at 183-184 (quotation omitted). "[A]ctual malice may be inferred from conduct and surrounding circumstances." *Id*. at 184.

Defendants have argued that MXR cannot maintain its tortious interference claim with its breach of contract claim for failure to identify an independent duty or breach. This argument ignores that, under Ohio law, a party can maintain both a breach of contract claim and a tortious interference with business relations claim if (1) there is a motive to interfere with the injured party's business relations and (2) the interference is not merely incidental to the breach. *Key Realty, Ltd. v. Hall*, 2021-Ohio-1868, ¶ 83, 173 N.E.3d 831, 854, *aff'd*, 2022-Ohio-1199, 167 Ohio St. 3d 152, 189 N.E.3d 785 (reversing summary judgment on tortious interference claim, holding that "a reasonable factfinder as evidence that [defendant] had a distinct motive to raid [plaintiff's] agents… and, therefore, any interference with [plaintiff's] agent relationships was not merely incidental to any breach of his noncompete agreement."). The same is true here—as discussed extensively above in Section II.A.6.—9., *supra*, Defendants were motivated to, and in fact did, interfere with MXR's business relationships with both OEMs and customers.

### 6. MXR Will Prevail on Its Claim for Breach of the Duty of Loyalty

MXR will prevail on its claim for breach of the duty of loyalty against Zavagno. Ohio common law provides that "an employee owes a duty to act in 'the utmost good faith and loyalty toward his employer.'" *Orbit Elecs., Inc. v. Helm Instrument Co.*, 855 N.E.2d 91, 100 (Ohio 2006), quoting *Connelly v. Balkwill*, 116 N.E.2d 701, 707 (Ohio 1954). "The duty of loyalty is based on an implied condition of employment that an employee will 'act in good faith and not act to the detriment' of the employer." *Cheryl & Co. v. Krueger*, 536 F. Supp. 3d 182, 212 (S.D. Ohio 2021). This duty is breached "when an employee engages in competition with the employee's present

23

employer while still employed." *Integrity Express Logistics, LLC v. Grgurich*, No. 1:23-CV-581, 2025 WL 905629, at *2 (S.D. Ohio Mar. 25, 2025).

It is beyond dispute that after the parties entered into the APA in 2017, Zavagno was employed by MXR and remained so employed until the Termination Date in 2024, first pursuant to his Employment Agreement and then as an at-will employee.  As such, under governing Ohio law, he owed a duty of loyalty to MXR for the period of his employment.  At trial, MXR will prove that it purchased substantially all of the assets of Zavagno's former company, UMS, to enter into the veterinary space—the purchase of which provided Zavagno with at least $3,745,000. To protect MXR's multi-million dollar investment, Zavagno entered into robust confidentiality, non-competition, non-solicitation, and non-disparagement covenants with MXR. As set forth above, in flagrant breach of those restrictive covenants and his duty of loyalty to MXR, Zavagno, individually and through USD, directly competed against MXR by, among other things: (i) entering into agreements with Siemens to sell CT/MRI machines directly to MXR customers; (ii) utilizing MXR's confidential information to undercut MXR; (iii) impeding MXR's ability to enter into its own agreement with Siemens; and (iv) soliciting MXR customers. The evidence will demonstrate that Zavagno worked at both MXR and USD, splitting his time based on what entity would give him—and him alone—the most compensation, in direct breach of his duty of loyalty to MXR.

### 7. Defendants' Argument That MXR Released Its Claims is Meritless

Defendants contend that MXR released the first six counts of its Amended Complaint (*i.e.*, breach of the Employment Agreement; breach of the APA; unjust enrichment; misappropriation of trade secrets under both federal and Ohio law; and unfair competition) as part of the release in the Separation Agreement.  This contention is meritless.

24

*First*, the release in the Separation Agreement does not apply because pursuant to the terms of the Separation Agreement, it only applies to conduct that was within the scope of Zavagno's employment with MXR, and MXR's claims are based on Zavagno's improperly competitive conduct that occurred outside of the scope of his employment.

Under Ohio law, "courts apply general contract principles to releases." *H & M Servs., LLC v. All. Inventory Serv., LLC*, No. 2:23-CV-02822, 2025 WL 860371, at *4 (S.D. Ohio Mar. 19, 2025). "The purpose of contract construction is to discover and effectuate the intent of the parties. The intent of the parties is presumed to reside in the language they chose to use in their agreement." *Marrow v. SSOE, Inc.*, 599 F. Supp. 3d 593, 600 (N.D. Ohio 2022) (quoting *Graham v. Drydock Coal Co.*, 76 Ohio St. 3d 311, 313, 667 N.E.2d 949 (1996)). "Contract terms are generally to be given their ordinary meaning when the terms are clear on their face," and courts must "apply the plain language of the contract when the intent of the parties is evident from the clear and unambiguous language in a provision." *Coma Ins. Agency v. Safeco Ins. Co.*, 526 F. App'x 465, 468 (6th Cir. 2013) (citing *Karabin v. State Auto. Mut. Ins. Co.*, 10 Ohio St. 3d 163, 166-67, 462 N.E.2d 403 (1984)). When interpreting the release in the Separation Agreement, the "general language cannot properly be read in isolation, but must be read in the context of the entire release." *H & M Servs., LLC,* 2025 WL 860371, at *5 (S.D. Ohio Mar. 19, 2025).

Defendants' argument ignores Section 4 of the release, which defines its scope as follows: "[t]he releases contained in this Agreement cover all rights, claims and causes of action of any kind which a party may have that are **related to Zavagno's employment with the Company or the termination of that employment**." (Emphasis added). The remainder of Section 4 addresses a unilateral release by Zavagno for any claim under federal or state law that has "any bearing whatsoever on the terms and conditions of [his] employment..." Therefore, for MXR to have

25

released its claims under the Separation Agreement, its claims must arise from either (i) actions in the scope of Zavagno's employment, or (ii) Zavagno's termination. Under Ohio law, for Zavagno's conduct at issue in MXR's Amended Complaint to be within his the scope of his "employment" at MXR, Zavagno's conduct must have been "calculated to facilitate or promote the business for which the [Zavagno] was employed" at MXR. *Kubala v. Smith,* 2023-Ohio-991, ¶ 11, 211 N.E.3d 1247, 1253. Put differently, "self-serving acts are not within [Zavagno's] scope of employment." *Id.* at ¶ 12.

Applying the plain language of the Separation Agreement, MXR's claims—which arise from Zavagno directly competing against MXR in violation of his contractual and legal obligations (Am. Compl., ECF No. 57)—are not "related to Zavagno's employment with [MXR] or the termination of that employment," as these claims regard conduct outside of Zavagno's employment at MXR.

*Second*, even if the release did apply (it does not), MXR will prove that it complied with the Separation Agreement by providing Zavagno with notice "in reasonable detail" of its claims.

The Separation Agreement provided that the parties each released claims *except* those "raised *in reasonable detail* and in writing prior to the Termination Date" of May 31, 2024. "Reasonable" is defined by Webster's as "moderate" or "fair." *Univ. of Akron v. Ohio Dep't of Job & Fam. Servs.,* 2009-Ohio-3172, ¶ 15. Similarly, "Black's Law Dictionary defines 'reasonable,' in pertinent part, as: Fair, proper, or moderate under the circumstances; sensible." *Kent State Univ. v. Hannam,* 2019-Ohio-2971, ¶¶ 18-19. Applying this straightforward definition, nothing in "reasonable" "requires absolute certainty or a guarantee," and instead is "necessarily something less than an absolute guarantee." *Id.* ¶ 21.

Here, MXR provided Zavagno with notice, in "reasonable detail," of its claims in its May 2024 claims notice letter. Therein, MXR described in reasonable detail the facts MXR had learned—*as of May 14, 2024*—that formed the basis of its claims against Zavagno: that Zavagno sold "MRI equipment directly to MXR customers without involving or compensating MXR." Accordingly, MXR preserved *all* of its claims based on this conduct—that Zavagno engaged in competitive conduct, individually and through USD, to MXR's detriment. Nothing in the Separation Agreement required MXR to provide Zavagno with a count-by-count recitation of each and every claim it had against him as of May 14, 2024 or provide such exacting language to preserve its claims. Rather, the Separation Agreement simply required notice, in "reasonable detail," which MXR undoubtedly provided.

Accordingly, MXR did not release any of its claims against Defendants.

**B.     Zavagno Will Not Prevail On His Sole Counterclaim for Breach of Contract**

Zavagno will not prevail on his sole counterclaim for allegedly unpaid commissions, which is based on alleged breaches of the 2020 Employment Letter, the 2023 Commission Agreement, and the Separation Agreement because Zavagno will be unable to prove that there are any commissions owed to him under these agreements that MXR either did not pay or did not offer to pay.

*First*, Zavagno is precluded from seeking additional commissions payments by the 2019 and 2021 offset agreements, which bar his claims for additional commissions prior to the dates of those agreements. The evidence will demonstrate that Zavagno entered into, and accepted payments pursuant to, those agreements, which confirm Zavagno was fully satisfied and that MXR owed him no further commissions. The August 2023 accounting and audit, pursuant to which Zavagno accepted a $73,029.90 additional commissions payment from MXR, is an even more direct cutoff of Zavagno's claim for additional commissions prior to that date.

27

These offset agreements are binding contracts between MXR and Zavagno, and he cannot escape their terms. Ohio law is clear that "one who signs a contract without first making a reasonable effort to learn what is in it may not in the absence of fraud or mutual mistake, avoid the effect of such contract." *Gartrell v. Gartrell*, 908 N.E.2d 1019, 1022 (Ohio Ct. App. 2009). Zavagno cannot provide any evidence that the offset agreements were the product of fraud or mutual mistake. Nor can he establish that the offset agreements are rescindable based on his own unilateral mistake in calculating the commissions owed to him, as Zavagno would have to show "by clear and convincing evidence: (1) that [he] made a mistake at the time the contract was entered into, (2) that the mistake had a material effect on the agreed exchange of performances that was adverse to the mistaken party; and (3) that [MXR] party knew or should have known of that mistake." *O'Keeffe v. Cenlar Agency, Inc.*, No. 2:22-CV-4070, 2024 WL 4266018, at *4 (S.D. Ohio Sept. 23, 2024). The evidence at trial will demonstrate that Zavagno, individually and with assistance from his accountant John Zalick, negotiated the terms of the offset agreements with MXR. As such, rescission by unilateral mistake "*will not* be provided where such mistake is the result of the negligence of" Zavagno. *Marshall v. Beach*, 143 Ohio App. 3d 432, 437, 758 N.E.2d 247, 251 (2001) (emphasis in original).

The affirmative defense of accord and satisfaction also bars Zavagno's commissions counterclaim based on the offset agreements and MXR's prior payments to Zavagno. The Ohio Supreme Court has held:

> Accord and satisfaction is an affirmative defense to a claim for money damages. If a party against whom a claim for damages is made can prove accord and satisfaction, that party's debt is discharged by operation of law.
>
> An accord is a contract between a debtor and a creditor in which the creditor's claim is settled in exchange for a sum of money other than that which is allegedly due. Satisfaction is the performance of that contract.

\* \* \* \* \*

> When an accord and satisfaction is pled by the defendant, the court's analysis must be divided into three distinct inquiries. First, the defendant must show that the parties went through a process of offer and acceptance—an accord. Second, the accord must have been carried out—a satisfaction. Third, if there was an accord and satisfaction, it must have been supported by consideration. The first and second inquiries merge when the creditor manifests acceptance of the offer by negotiating a check sent by the debtor with the offer. At common law, an accord and satisfaction is accomplished when a creditor accepts and deposits a check which the debtor offers as full payment for an unliquidated or disputed debt. By cashing the check, the creditor manifests assent to the terms of a new contract which extinguishes the debtor's prior contractual obligation.

*Allen v. R.G. Indus. Supply*, 1993-Ohio-43, 66 Ohio St. 3d 229, 231, 611 N.E.2d 794, 797 (international quotations and citations omitted).

Here, MXR will demonstrate that there was an accord and satisfaction of all of Zavagno's claims for commissions prior to August 2023 via MXR's good faith negotiation and settlement of commissions disputes with Zavagno in the 2019 and 2021 offset agreements, and through the August 2023 accounting, pursuant to which MXR tendered, and Zavagno accepted, payments of commissions.[3]

*Second*, to prove his claim for breach of contract, Zavagno must establish "(1) the existence of a contract; (2) performance by [Zavagno]; (3) breach by [MXR]; and (4) damages." *Byers DiPaola Castle LLC*, 41 N.E.3d at 94. He cannot do so because he cannot establish the required elements of breach and damages. Zavagno cannot prove that any of the agreements he claims MXR breached entitle him to any additional commissions. For example, two years into this litigation and well after his Termination Date, Zavagno now claims that he is somehow entitled to

---

[3] Zavagno's acceptance of commissions payments pursuant to the 2019 and 2021 offset agreements and the August 2023 accounting and true-up also establish that he knowingly waived his right to any additional commissions prior to August 2023. *See Glidden Co. v. Lumbermens Mut. Cas. Co.*, 112 Ohio St.3d 470, 478 (2006) ("Waiver is a voluntary relinquishment of a known right and is generally applicable to all personal rights and privileges, whether contractual, statutory, or constitutional."); *Pollard v. Elber*, 123 N.E.3d 359, 370 (Ohio Ct. App. 2018) ("A party asserting waiver must prove it by establishing a clear, unequivocal, decisive act by the other party, demonstrating the intent to waive.").

commissions for sales to all national accounts and for products and equipment beyond MRIs and CTs.  None of the agreements pursuant to which Zavagno brought his breach of contract claim require that he be paid commissions on these types of sales, and MXR's testimony will establish that MXR never agreed to such terms.  Similarly, Zavagno claims he is entitled to unpaid commissions for sales that predated any of those agreements and, therefore, are not covered by them.  Zavagno also cannot establish that he was damaged because the evidence at trial will demonstrate that MXR already has paid him (or offered to pay him) for all commissions he was owed pursuant to the terms of any valid, governing agreement.

The eleventh hour opinion of Zavagno's proffered damages expert, Jeffrey Firestone, is unavailing and does not support Zavagno's commissions claim.  Indeed, Mr. Firestone does not establish Zavagno's entitlement to any commissions at al; rather, he does no more than serve as a glorified calculator, adding up the commissions that Zavagno baselessly claims he is owed.

*Third*, even if there were additional commissions to which Zavagno may be entitled (there are not), to be entitled to such commissions, under Ohio law, Zavagno must show that he was the "procuring cause" of the sale.  *Upper Valley Realty, Inc. v. Hanson*, 2006-Ohio-314, ¶ 26 (citing *Bauman v. Worley*, 166 Ohio St. 471, 473 (1957)).  The procuring cause doctrine is an equitable tool which permits a broker to recover a commission for the sale of property in the absence of a contract explicitly entitling the broker to the commission.  *See Union Sq. Realty, Inc. v. Golfers & Hackers, Inc*., 2011-Ohio-1882, ¶ 59.  "A procuring cause is a cause originating a series of events which, without break in their continuity, result in the accomplishment of the prime objective of the employment of the broker, producing a ready, willing and able buyer on the owner's terms." *Id*.; *see also Hoke v. Marcis*, 127 N.E.2d 54, 56 (Ohio Ct. App. 1955) (same).  Although *Bauman*, which established the procuring cause doctrine, arose in the real estate brokerage context, Ohio

30

courts have applied this doctrine to sales commission disputes more broadly and found that "the [procuring cause] doctrine works in conjunction with, and not in place of, the agreement between the parties." *Davis & Tatera, Inc. v. Gray-Syracuse, Inc.*, 796 F. Supp. 1078, 1084 (S.D. Ohio 1992) (applying the procuring cause doctrine to the representative of an Ohio manufacturing firm that sought post-termination sales commissions).

"[T]he purpose of the 'procuring cause' theory is to prevent an agent from being denied a commission on a sale for which the agent performed the majority of the work and brought the sale essentially to fruition." *Davis & Tatera, Inc.*, 796 F. Supp. at 1084.  While the broker's efforts need not be the sole cause of the sale, they generally must be the predominant cause for the broker to be entitled to the commission under Ohio law. *Vincent v. Weber*, 13 Ohio Misc. 280, 232 N.E.2d 671, 675 (Mun. 1965) ("Plaintiff real estate broker must establish that he is the primary proximate, and procuring cause, and it is not enough that he may have planted the seed from which the harvest was reaped."). In *Vincent*, the court noted that "if the negotiations are broken off and the broker thereafter abandons his efforts, or there is a substantial break in negotiations and the transaction is subsequently concluded by the principal without the aid of the broker, he may be denied any commissions." *Id*. Importantly, the procuring cause theory is linked to the acquisition of particular orders by the agent, *not customers*. *Davis & Tatera, Inc.*, 796 F. Supp. at 1084 (citing *William Kehoe Assoc. v. Indiana Tube Corp*., 891 F.2d 293 (table), (6th Cir.1989) ("[I]t is the acquisition of orders, not the acquisition of the customer that is protected by the "procuring cause" doctrine")).

Zavagno has not demonstrated—and cannot demonstrate—that he is the "procuring cause" of any sale for which he has not already received (or for which MXR has not already offered to pay) a commission.  The evidence in this case simply does not support such a claim.

31

*Finally*, any claims Zavagno has for commissions predating September 30, 2018 are barred by the six-year statute of limitations on his contract claim, which he first asserted in this case on September 30, 2024.  O.R.C. 2305.06.

Accordingly, Zavagno will not prevail on his breach of contract claim for unpaid commissions at the upcoming trial of this matter.

## IV.    LIST OF PROPOSED WITNESSES

MXR's list of proposed witnesses, with a brief description of the subject matter of the testimony of each witness, is attached hereto as **Exhibit 1**.

## V.    INDEX OF PROPOSED EXHIBITS

MXR's list of proposed exhibits, containing a brief description of each exhibit, is attached hereto as **Exhibit 2**.[4]

## VI.    DISCUSSION OF ANY EVIDENTIARY ISSUES LIKELY TO ARISE AT TRIAL

The parties have filed many motions *in limine* in advance of trial to address evidentiary issues that are likely to arise. MXR currently does not anticipate any specific additional evidentiary issues that are likely to arise at trial other than those that have been, or currently are, being briefed to the Court.

## VII.    ANY PROPOSED *VOIR DIRE* QUESTIONS

MXR's Proposed *Voir Dire* Questions are attached hereto as **Exhibit 3**.

---

[4] As the Court is aware, MXR was forced to file an Emergency Motion to Enforce Court Order Pursuant to Fed. R. Civ. P. 37(b) on June 12, 2026, based on Zavagno's failure to ship his devices to the forensic examiner for the forensic examination as required pursuant to the Court's Memorandum Order and Opinion, ECF No. 91. (ECF No. 121.) On June 24, 2026, the Court ordered that "it is imperative that [Zavagno] have his devices imaged prior to the trial date of July 13, 2026. Accordingly, Mr. Zavagno must send his devices to iDS in California." (Memorandum Order and Opinion, ECF No. 140.) Because of Zavagno's delays, MXR still does not have the results of the forensic examination of Zavagno's devices, which has prejudiced its ability to review and designate documents in its trial exhibit index. Accordingly, MXR reserves the right to supplement its trial exhibit index upon receipt and review of the imaging of Zavagno's devices.

32

## VIII.    PROPOSED JURY INSTRUCTIONS

MXR's Proposed Jury Instructions and Proposed Verdict Forms are attached hereto as **Exhibits 4 and 5**, respectively.[5]  Electronic versions of these documents have also been emailed to the Court.

## IX.    CONCLUSION

For the foregoing reasons, MXR will prevail at the upcoming trial on its claims, and Zavagno will fail to establish his sole breach of contract counterclaim against MXR.

Dated: July 8, 2026

Respectfully submitted,

*/s/ Paul R. Harris*
Paul R. Harris (0079538)
John R. Mitchell (0066759)
Daniela Paez (0091212)
Katherine M. Poldneff (0088529)
Jack Maib (0098846)
Taft Stettinius & Hollister LLP
200 Public Square, Suite 3500
Cleveland, Ohio 44114-2302
Telephone: (216) 241-2838
Fax: (216) 241-3707
pharris@taftlaw.com
jmitchell@taftlaw.com
dpaez@taftlaw.com
kpoldneff@taftlaw.com
jmaib@taftlaw.com

*Attorneys for Plaintiff MXR Imaging, Inc*

---

[5] Although the parties have conferred regarding the Proposed Jury Instructions pursuant to the Court's Civil Trial Order (ECF No. 48), they are still in the process of doing so regarding defenses, among other things, and expect to be able to submit a new set of Proposed Jury Instructions with additional joint instructions in advance of trial.

33

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2026, the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Paul R. Harris
Paul R. Harris (0079538)

*One of the Attorneys for*
*Plaintiff MXR Imaging, Inc.*

34